62 So.2d 71 (1952)
GLUCK
v.
STATE.
Supreme Court of Florida, en Banc.
December 22, 1952.
*72 Albert D. Hubbard and Henry R. Carr, Miami, for appellant.
Richard W. Ervin, Atty. Gen., and Leonard Pepper, Asst. Atty. Gen., for appellee.
MATHEWS, Justice.
The appellant was charged with rape and convicted of the offense of assault with intent to commit rape.
In his opening statement to the jury the Assistant State Attorney stated to them, "We will also present evidence of a former similar act" and referred to the appellant as "a man that had never been employed in five years." At the conclusion of the statement by the Assistant State Attorney, the appellant objected to such statements, called them to the court's attention and made a motion for a mistrial, which was denied.
There was no question about the defendant's identity, that he knew the woman and that he had had sexual intercourse with her at the time and place mentioned. The defense was that the act was with her consent. During the course of the trial the State, over the objection of the appellant, introduced evidence by a woman of an alleged offense committed some 3 or 4 years prior to the alleged act for which appellant was being prosecuted. She related all of the alleged details of the offense to the same extent as if the appellant was being tried for that offense.
In the course of the trial the Assistant State Attorney referred to the fact that the mother and wife of the appellant was "sticking to him" and stated:
"I would not doubt that they will stick by as long as they are able. This is one admirable trait of the people of this religion. No matter what the husband does, he can do anything without any complaint by the wife * * *."
Near the conclusion of his address to the jury the Assistant State Attorney hurled epithets at the accused so foul, vile, abusive and obscene as to be unquotable in this opinion.
The following took place after the epithets were used:
"Mr. Carr: We would like the Court to caution and admonish the State's Attorney that such conduct is highly irregular * * * that type of language.
"Mr. Mincer: That seems to be the facts in this case.
"The Court: It will be denied."
The above quotation of what took place, not only shows a determination on the part of the Assistant State Attorney to have his highly prejudicial remarks remain imbedded in the minds of the jury, but also, that the Court approved such remarks.
In the case of Simmons v. State, 139 Fla. 645, 190 So. 756, 758, this Court used the following language:
"It is well settled that statements or intimations by the prosecuting attorney that accused has committed other crimes besides that for which he is now on trial constitutes error."
In the case of Huggins v. State, 129 Fla. 329, 176 So. 154, 155, error was alleged on the ground that the State Attorney in his argument to the jury repeatedly referred to the defendants as Negroes and made many remarks derogatory to the Negro race and highly prejudicial. The transcript of the record did not show that such remarks were made by the State Attorney. However, this Court said:
"If the transcript of the record showed by the authenticated bill of exceptions that the state's attorney indulged in the argument attributed to him in this ground of the motion a new trial would be awarded."
In the case of Stewart v. State, Fla., 51 So.2d 494, in an opinion by Mr. Justice Terrell, this Court said:
"We have not only held that it is the duty of counsel to refrain from inflammatory and abusive argument but that it is the duty of the trial court on his own motion to restrain and rebuke counsel from indulging in such argument."
The appellant was presumed to be innocent until he was found guilty as a result of a fair and impartial trial. He was *73 charged with a particular crime and that alone. Neither his religion, character, alleged prior offense, nor occupation were proper issues in the case. The conduct, attitude and remarks, which were seasonably called to the attention of the Court and objected to, were highly prejudicial and even if not calculated to, undoubtedly had an influence upon the jury in the rendition of their verdict. State Attorneys and their assistants are quasi judicial officers of the court. It is their duty to see that a defendant gets a fair and impartial trial. When such matters, as herein set forth, are called to its attention, it is the duty of the Court to reprimand the prosecuting officer, sustain the objections and, if possible, make it clear to the jury that the Court does not condone the conduct of the prosecuting officer, and eradicate the same from the minds of the jury. If that cannot be done, a new trial, or a mistrial, should be granted. See Deas v. State, 119 Fla. 839, 161 So. 729.
The record in this case discloses that the appellant did not receive a fair and impartial trial.
Reversed, with directions to set aside the judgment, sentence and order denying a new trial, and to grant the motion for a new trial.
THOMAS, MATHEWS and DREW, JJ., concur.
TERRELL, J., concurring specially.
SEBRING, C.J., and ROBERTS, J., dissent.
TERRELL, Justice (concurring).
I concur in the opinion of Mr. Justice MATHEWS. I have no more patience with the behavior pattern of appellant than was evidenced by the Assistant State Attorney, but when one is on trial for crime, assaults on his character, occupation and religion, including attempts to introduce evidence of other offenses, are not only in bad taste, they are out of place and repugnant to fair and impartial trial as guaranteed by the Bill of Rights. First ten Amendments to Federal Constitution.
The Bill of Rights proceeds on the theory that civil and political rights inhere in the people, who cannot be deprived of them without due process. It not only guarantees one a speedy trial by an impartial jury, it guarantees freedom of worship, freedom of speech and press, freedom of conscience, freedom of assembly and the right to bear arms; it protects one against unreasonable search and seizure of his house, papers and effects, and provides that he shall not be deprived of life, liberty or property without due process of law. It protects him against excessive bail, cruel and unusual punishment and shields his property from public use without just compensation. It protects the right to contract and safeguards other fundamental concepts that flow from those enumerated or are implicit in them. The 13th, 14th and 15th amendments, sometimes known as the Civil Rights Amendments, added to and duplicate some of those defined in the original document.
The Bill of Rights became a part of the Federal Constitution December 15, 1791, but it had been made a part of the fundamental law of Virginia June 12, 1776, and was embedded in other State or Colonial Constitutions. It has its grass roots in Magna Charta, June 15, 1215, but it took shape and was first declared to be the rights of British subjects in Chapter 2, Statutes of William and Mary, Second Session of Parliament 1688. Its declared purpose was to guarantee the personal and political liberty of Englishmen; it was directed to the iniquities of autocratic authority; it struck down the philosophy of the Divine Right of Kings and substituted for it the philosophy that sovereignty resides in the people. Its counterpart is attached to all the state constitutions.
The Founding Fathers were so committed to the necessity of the Bill of Rights to free government that they refused to approve the Federal Constitution absent a compact to annex it to that instrument. It has been defined as a declaration of individual rights reserved in the charter of government to safeguard the welfare of free people. The imperatives of the Bill of Rights are relative, not absolute, they defy concise definition but they are flexible enough to meet the complexities of changing circumstances. They are nevertheless considered essential to a democratic republic *74 that recognizes no absolute, unbriddled, arbitrary power over the life, liberty or property of the people. The Bill of Rights was the first attempt to spell out the boundary between democratic and autocratic government.
Autocratic power is no different from what it was when the Bill of Rights was extracted from the autocrats. It is different in name only. It was first called absolute or limited Monarchy. We now call it socialism or some form of totalitarianism, whether socialism, communism, fascism, or nazism is not material. They all have to do with the same concept in different states of its development. They proceed on the theory that the individual is inert, raw material that does not know what is good for him, but must look to the state for his economic, political and moral salvation. The guarantees vouchsafed us by the Bill of Rights would soon regress to the totalitarian pattern if not exercised with restraint and with due regard to the rights of others.
Man's inhumanity to his fellow man may not be confined to countries behind the iron curtain where the law is tested in terms of its effect on the state. Democracy, to the contrary, places the emphasis on the individual and tests the law in terms of its effect on him. Tested in this manner, it becomes a guide to correct habit patterns, rather than a straight jacket to tether the individual to the caprice of the Gestapo or Gendarme. I prefer having my civil and political rights administered by the Bill of Rights, clothed with due process, rather than by any totalitarian pattern. Under the Bill of Rights I can challenge with assurance the right and the method of those who admeasure them, as the defendant did in this case. On the other hand, if I challenge the method of admeasurement under the totalitarian method, I do so at the risk of facing the hangman's noose, or the firing squad. This old world has been good to me and I do not care for such a precarious tenure.
And that brings me to the point in this case. It is my view that the thrusts of the prosecuting attorney at defendant's character, religion and occupation were highly prejudicial and that when pyramided on the retaliation in kind by the attorney for defendant, trial was precipitated into an environment in which fair trial was very likely lost in the confusion. Defendant's character was not in issue and slurs on that, his religion or when he was last employed, had no place in the trial. It was in the very teeth of the guarantee of fair, and impartial trial. Nothing does so much to inspire confidence in our system of administering justice as the fair and orderly conduct of litigated causes. We were charged with notice of this when we were admitted to the bar. We took an oath to support the Bill of Rights and it does not add to our reputation for intellectual integrity to ignore its teachings. The point has been so frequently commented on by this Court that citation of supporting authority would be superfluous.
It is true that this case presented one of the nastiest spectacles that make their way to this Court, but that should not be a cue to launder it in kind. The Bill of Rights guarantees the most despicable defendant a fair and impartial trial. The ultimate consequence of such departures from orthodox procedure as pointed out here is the ultimate loss of all sense of restraint and failure to distinguish the Bill of Rights from the totalitarian pattern. To illustrate this thesis, I point to the execution of the eleven Czechoslovakia officers at Prague a few weeks ago on orders from Moscow without the semblance of a trial. Another example of totalitarian legal liquidation was the suppression of one of the leading newspapers of South America last summer, the LaPrensa of Buenos Aires, because the dictator thought that the content of its printed page was contrary to his concept of governmental philosophy.
A good many years ago the writer had the privilege of attending trials at Old Bailey and hearing cases presented to other Courts including the High Courts of Justice in London. They were conducted in a calm, dignified atmosphere, every appointment of the courtroom was in order and its decorum was perfect; there were no improper thrusts by counsel; (the judges were wigged and robed in crimson trimmed with ermine, a custom that had its origin *75 at the time the clergy heard trials). There was absence of a gavel, bailiff or other instrument to preserve order; the trial was conducted in calm restraint and what was accomplished in hours I have seen require days in the courts of our country. There was no attempt to distort the evidence or browbeat the witness. The whole scene inspired faith and confidence in the English trial system, though the bench and bar evidenced no more skill than is exemplified in our courts.
Fair and orderly administration of justice is the surest way to strengthen and perpetuate democratic processes. The Bill of Rights points the way to do this. No alternative to it has yet been devised but the totalitarian process. It is not difficult to fall into that if we permit passion and impulse, instead of discretion and reason to lead us.
About the turn of the century, Thomas R. Marshall quipped that the thing this country needs is a good five cent cigar. If he were to speak to us now, great American that he was, the recent charges and disclosures of communists lurking about Washington, in some of the institutions of high learning and elsewhere about the country, he would no doubt be prompted to say that the thing this country most needs is a baptism in the Bill of Rights.
For the reasons so stated I agree to the judgment of reversal.