[File No. 7359]

CESAR MEVORAH AND MARTIN SILLS, Individually and
as co-partners doing business under the firm name and style
of Irving's Tractor Lug Company, Respondents, v. IRVING
GOODMAN AND STANLEY GOODMAN, individually and
as co-partners, Appellants.

(57 NW2d 600)

444

Opinion filed March 5, 1953

445

*Lanier, Lanier* and *Knox,* and *Aaron Aronson,* for appellants.

*Burnett, Bergeson, Haakenstad & Conmy,* for respondents.

446

MORRIS, Ch. J. This is an action for damages for breach of contract. The defendants appeal from a judgment rendered upon a verdict of the jury in favor of the plaintiffs in the sum of $9,250.00. On June 23, 1950, the plaintiffs, as purchasers, and the defendants, as sellers, entered into a contract for the purchase and sale to the plaintiffs, conditionally, of the business known and operated as Irving's Tractor Lug Company, with branches in Fargo, North Dakota; Portal, North Dakota; and Wichita, Kansas. This business consisted of buying and selling new, reconditioned, and used parts of tractors and agricultural implements. The consideration was $100,000.00, of which $5,000.-00 was payable in cash and the balance to be represented by the joint and several promissory note of the plaintiffs, Martin Sills and Cesar Mevorah. Title to the stock of goods was retained by the defendants until all of the purchase price was paid. The contract also provided that in the event of default or breach by the purchasers, the sellers might take immediate possession of the property so sold and retain the same, together with all payments previously made, as liquidated damages. The sellers also agreed not to engage, directly or indirectly, in the retail or wholesale business of selling new tractor and farm implement parts in the normal trade territory of the three cities named in the contract, or engage in the foreign export of those items. The contract also provided:

"The sellers agree that they shall not conduct any other business in the name Irving's Tractor Lug Company." ‘
and stated that the violation of paragraph H, which included the agreement not to compete and not to use the name of Irving's Tractor Lug Company, "shall subject the sellers to pay the buyers the sum of $10,000.00 as and for liquidated damages." Other provisions of the contract will be referred to as they become pertinent to the discussion of points in controversy.

The complaint sets forth five causes of action. In the first cause of action it is stated:

"That on or about the 23rd day of June, 1950, the plaintiffs and defendants entered into an agreement in writing wherein and whereby the defendants sold to the plaintiffs the trade name of Irving's Tractor Lug Company as an outright sale, and also

sold to the plaintiffs on conditional sale a certain stock of goods and merchandise more specifically described in said written contract.

"That under the terms of said contract the sellers, the defendants herein, specifically agreed that they would not conduct any other business in the name of Irving's Tractor Lug Company and it was specifically provided in said written agreement that in violation of this covenant of the contract the sellers, the defendants herein, would pay to the buyers, the plaintiffs herein, the sum of $10,000 as and for liquidated damages.

"The plaintiffs allege that the defendants have violated the terms of the contract in this regard and have continued to use the name of Irving's Tractor Lug Company; that specifically the defendants have used bank drafts drawn in the name of Irving's Tractor Lug Company in purchasing scrap metal at Portal, North Dakota, which said bank drafts were drawn on the Fargo National Bank for the account of Irving's Tractor Lug Company and that the said defendants have used the said trade name in various other ways and that the plaintiffs have been damaged in this regard on account of said violation of the terms of the contract in the agreed sum of the liquidated damages amounting to $10,000."

In the second cause of action it is stated:

"That under and pursuant to the terms of the contract hereinbefore referred to it was provided that the defendants should countersign checks drawn by plaintiffs in the conduct of the business; and that the defendants should not arbitrarily or capriciously refuse to countersign such checks.

"The plaintiffs allege that the defendants have arbitrarily and capriciously and constantly refused to sign checks drawn for proper business purposes and have thus violated the terms of the contract resulting in damage to the plaintiff in the conduct of their business and in their credit relations in the sum of $10,000."

As the third cause of action it is stated:

"Plaintiffs further allege that the defendants have constantly in violation of the spirit, intent, purpose and provisions of the contract continually interfered with the plaintiffs in the con-

duct of the business so sold; in that they have among other things, acting either personally or through agents or servants, mingled new merchandise bought by the plaintiffs on their own account with the old merchandise sold conditionally to those plaintiffs; they have ransacked the plaintiffs' records at various times and have either taken said records or in all events caused them to be missing or so misplaced them that the plaintiffs have been unable to locate them; that they have constantly abused their privilege of using space in the office upon which the plaintiffs are paying the rent; that they have removed a partition placed in said office so that the plaintiffs do not have even a semblance of privacy in the conduct of their business; that they have used both the place of business at Fargo, North Dakota and the place of business at Portal, North Dakota and the facilities thereof for the purpose of conducting a scrap iron and scrap metal business contrary to the terms of the contract and that on account of the violations set forth in this paragraph the plaintiffs have been damaged in the sum of $15,000."

As a basis for a fourth cause of action the plaintiffs state:

"That under the terms of said contract it was specifically provided that the sellers, the defendants, herein, would furnish to the buyers, the plaintiffs herein, a written list of the names and addresses of the creditors of Irving's Tractor Lug Company showing the amount of indebtedness due to each and certified by the sellers under oath to be a full, accurate and complete list of the creditors and of their indebtedness.

"That pursuant thereto the defendants did furnish to the plaintiffs a list of creditors which list was made under oath and which list the plaintiffs allege is incomplete and therefore false.

"That incident and related to the failure of the defendants to give to the plaintiffs a full list of their creditors, the plaintiffs allege on information and belief that the statement and account of the defendants business shows bank over-drafts in the amount of approximately $16,000; the plaintiffs also allege on information and belief that these so called bank over-drafts actually represent checks drawn by the defendants to creditors not listed entitled to refunds or having other claims against

the business of Irving's Tractor Lug Company before it was sold to these plaintiffs, which said checks were actually never mailed out to the creditors concerned.

"The plaintiffs further allege relative to the failure of the defendant to give a true and complete list of their creditors; that since June 23, 1950, there have been many and in fact, a constant stream of demands for refunds coming into Irving's Tractor Lug Company on account of orders given and paid for but not filled by the defendants when they conducted such business.

"That incident and related to the failure of the defendants to give a full list of their creditors, there has been sent to Irving's Tractor Lug Company various credit memos for funds due various customers who had done business with Irving's Tractor Lug Company prior to its purchase by these plaintiffs and which credit memos were issued by the defendants and there are also letters and claims coming into Irving's Tractor Lug Company from all parts of the United States and Canada because of credit on open account due to various customers of Irving's Tractor Lug Company on transactions arising before the sale to the plaintiffs.

"That on account of and as a result of the failure of the defendants to furnish a true and complete list of the creditors and the amounts owing and because of the developments thereafter and as an outgrowth thereof the plaintiffs have been damaged in the sum of $15,000."

In plaintiffs' fifth cause of action it is alleged:

"That the defendants have issued numerous checks dated before June 23, 1950, drawn on the Bank of Montreal at Estevan, Saskatchewan, Canada; that said checks were either not mailed out to the people named therein until a later date or were not paid for lack of funds; that since these plaintiffs acquired ownership of the account of Irving's Tractor Lug Company in the Bank of Montreal at Estevan, Saskatchewan, Canada and have deposited their funds therein, the said checks representing debts owing by the defendants have been banked, cashed and charged against the account owned by these plaintiffs and that on this

account the plaintiffs have been damaged in the sum of $5000.00.''

The defendants answered by way of general denial, and further alleged in an amended answer:

"That prior to the alleged claim of breaches by the defendants, the Plaintiffs breached said contract in the following respects:

"That the plaintiffs repeatedly refused to take an inventory of the parts at Fargo, North Dakota, and that in spite of the insistence of the defendants such inventory was never taken.

"That the plaintiffs repeatedly made errors on settlement sheets whereby they listed 60 per cent items in the 10 per cent column.

"That the plaintiffs repeatedly refused to make an accounting to the defendants and to turn over payments to them when the accumulated sales had aggregated $500 or more.

"That the plaintiffs repeatedly issued checks not countersigned by these defendants. And they went so far as to secretly and without notice to defendants open a special and separate account in the Dakota National Bank of Fargo, North Dakota, under the account name of Irving Tractor Lug Company, special account.

"That the plaintiffs refused the defendants free access to their books and records and even went so far as to remove said books and records from the premises at Fargo, North Dakota; that the plaintiffs refused at all times to allow the defendants to examine these books and accounts at Portal, North Dakota; and that these books have never been examined to this date.

"That the plaintiffs held out hundreds of copies of sales slips, inventory slips so as not to have to report a full accounting to these defendants on the settlement sheets.

"That the plaintiffs cashed checks and money orders and used the proceeds for their own benefit rather than to deposit them in the account at the Dakota National Bank. And then deliberately by their bookkeeping and accounting covered up these cashing of checks and money orders and appropriating of the funds to their own use and benefit.

"That the plaintiffs have accepted cash checks and money orders from customers throughout the United States and Canada

without fulfilling and delivering the merchandise purchased. And that said cash has been expended by them with no refund being made to the customer or goods delivered. Thereby destroying the reversionary interest that the defendants have in the trade name, Irving Tractor Lug Company. That the plaintiffs at all times failed and refused to cooperate under the terms of conditional sales contract herein, and have refused to fill orders for which the defendants had merchandise on hand or quoted such merchandise at such an exorbitant price as to discourage the buyer. That the plaintiffs were in such precarious financial condition as to endanger the security of the defendants under the terms of the conditional sales contract."

The transcript is voluminous and the record contains some 120 exhibits consisting of about 2,000 checks, drafts, orders, invoices, and items of correspondence. There are 43 specifications of error, some of which involve the sufficiency of the evidence. No question of the sufficiency of the evidence to sustain the verdict is before us. The defendants made no motion for a directed verdict and did not move for a new trial. Under our practice it is well settled that in a civil case the question of the sufficiency of the evidence to support the verdict cannot be raised in the supreme court unless it has been first presented to the trial court by a motion for a directed verdict or a motion for a new trial. Westerso v. City of Williston, 77 ND 251, 42 NW2d 429; State v. Van Horne, 71 ND 455, 2 NW2d 1; Lueck v. State, 70 ND 604, 296 NW 917; Baird v. Stephens, 58 ND 812, 228 NW 212; Olson v. Great Northern R. Co., 56 ND 690, 219 NW 209; Jacobson v. Klamann, 54 ND 867, 211 NW 595; Veum v. Stefferud, 50 ND 371, 196 NW 104; Rokusek v. National Union Fire Ins. Co., 50 ND 123, 195 NW 300; Bailey v. Davis, 49 ND 838, 193 NW 658; Horton v. Wright, Barrett & Stilwell Co., 43 ND 114, 174 NW 67; Erickson v. Wiper, 33 ND 193, 157 NW 592; Buchanan v. Occident Elevator Co., 33 ND 346, 157 NW 122; Freerks v. Nurnberg, 33 ND 587, 157 NW 119; Morris v. Minneapolis, St. P. & S. Ste. M. R. Co., 32 ND 366, 155 NW 861.

It is undisputed that the plaintiffs assumed control of the business of Irving's Tractor Lug Company on July 1, 1950, and

operated it until February 5, 1951, when the business was repossessed by the defendants.

Defendants' specifications of error, in so far as they raise questions reviewable in this court, fall into two categories—challenges to the trial court's rulings on admission or exclusion of evidence and challenges to instructions given by the court or requested by defendants and refused by the trial judge.

The defendants specify as error the admission over their objection of plaintiffs' exhibits 2 to 19 inclusive, being a series of drafts issued in the name of Irving's Tractor Lug Company and drawn on the Fargo National Bank of Fargo, North Dakota, during the period in which the plaintiffs were operating the business. These drafts were issued at the direction of the defendants in payment of the purchase of scrap metal by the defendants and not as a part of the business which was operated by the plaintiffs. These exhibits were clearly admissible on the question of whether the defendants violated their agreement not to conduct business in the name of Irving's Tractor Lug Company, as claimed by the plaintiffs under their first cause of action. The defendants argue that these exhibits, as well as others introduced later, do not show a material or substantial breach of the contract. This, however, is a matter of the weight of the evidence and does not go to the admissibility of the exhibits which were clearly relevant under the pleadings. The bank account against which these items were drawn and charged was the account of Irving's Tractor Lug Company, then operated by the plaintiffs.

A similar bank account was kept in the Bank of Montreal, Estevan, Saskatchewan. The contract provided that until the purchase note was paid the sellers or their agents should have the right to countersign all checks issued by the buyers in the conduct of the business of Irving's Tractor Lug Company and that "The sellers may not refuse to countersign any check arbitrarily or capriciously so long as the check is issued for a proper business purpose."

The contract contains a provision that the sellers agree to furnish the buyers a written list of names and addresses of creditors with the amount of indebtedness due each. A list furnished pur-

suant to this provision was introduced in evidence. The defendants claim it was error for the court to admit in evidence exhibit 36, which was a bundle of about 160 checks for small amounts under $35.00 issued against Irving's Tractor Lug Company account in the Bank of Montreal and payable to parties not listed as creditors. The defendant, Irving Goodman, testified that they had been issued mostly for refunds to customers for indebtedness that was outstanding prior to July 1, 1950. This exhibit was properly admitted as being material under plaintiffs' fourth cause of action, wherein it is contended that the defendants failed to furnish a true and complete list of creditors as required by the contract. Similar objections were made to the introduction of checks and drafts issued to unlisted creditors and to credit memorandums that had been issued in lieu of cash refunds to customers. These memorandums entitled the customers to apply the amounts specified therein on future purchases. We find no error in the admission of any exhibits of this nature. If, as the defendants claim, the bank accounts of Irving's Tractor Lug Company were reimbursed by the defendants for all such items charged against them, that fact does not render the admission of these exhibits erroneous. Reimbursement would be for the jury to consider in connection with the assessment of damages. Exhibits 48 to 62 inclusive are checks written for the purpose of paying the credit memorandums. These checks were also admissible for reasons already stated as being material to the issue as to whether the list of creditors furnished to the plaintiffs by the defendants complied with the provisions of the contract.

In a group of specifications the defendants assert that the trial court erred in sustaining objections to questions asked on cross-examination of plaintiffs' witnesses during the presentation of the plaintiffs' main case. We will discuss illustrative instances from this group of specifications.

The propriety of the examination of witnesses and the order in which evidence is presented are matters largely within the sound discretion of the trial court and his rulings will not be disturbed in the absence of a showing of abuse of discretion. State v. Kerns, 50 ND 927, 198 NW 698; State v. Tolley, 23 ND

284, 136 NW 784; State v. Hazer, 57 ND 900, 225 NW 319; People v. Logie, 321 Mich 303, 32 NW2d 458. These are criminal cases, but the same rule is also applied in civil actions. Ruddick v. Buchanan, 37 ND 132, 163 NW 720; Schwoebel v. Fugina, 14 ND 375, 104 NW 848; 58 Am Jur, Witnesses, Section 631. The rule is applicable to the cross-examination of a witness for purposes of impeachment. State v. Kerns, supra.

The witness Alpers testified that he formerly worked for the defendants when they were operating Irving's Tractor Lug Company and continued to work for that concern after the plaintiffs took it over and until October 1950. This witness identified a number of drafts which he drew in the name of Irving's Tractor Lug Company on the Fargo National Bank. The drafts were for the purchase of scrap iron made by the Goodmans after the plaintiffs had taken over the company, the point of this testimony being an attempt to show that the defendants used the name of the company in violation of the contract. In an attempt to impeach this witness, defendants' counsel asked these questions to which objections were sustained:

"Now, Mr. Alpers, at the time you left the employ of Mevorah and Sills, did you not receive a letter from Mr. Mevorah accusing you of taking parts books out of the Portal Branch?"

"Did you ever have any other trouble with Mevorah and Sills on not filling orders for them?"

The questions do not fall within the range of proper impeachment. They intimate that the witness had had some trouble with the plaintiffs for whom he was testifying. This indicates no prejudice against the defendants and the nature of the questions is not such as to indicate their answers would in any way affect the witness's credibility.

The defendants complain that they were unduly and erroneously restricted by the trial court in the cross-examination of the plaintiff, Martin Sills. The instance having the greatest semblance of merit grows out of this situation: The contract provided that all money received in the course of the buyers' business should be deposited in the Fargo National Bank "or other bank mutually agreeable to the parties." It appears from the testimony of the plaintiff Sills, and from other evi-

dence, that an account was carried in the Dakota National Bank in the name of the Irving's Tractor Lug Company by agreement of the parties. The defendants' answer alleges that prior to the claim of breaches by the defendants the plaintiffs breached the contract in a number of respects, including this: "they went so far as to secretly and without notice to defendants open a special and separate account in the Dakota National Bank of Fargo, North Dakota, under the account name of Irving Tractor Lug Company, special account." In the cross-examination of Sills as a part of the plaintiffs' main case, these questions were asked and objections thereto sustained:

"I will ask you, Mr. Sills, did you go to the Dakota National Bank and open another bank account?"

"All right, Mr. Sills, now from your daily receipts from your business, Irving's Tractor Lug Company, did you deposit them in any other account than the account set up in the contract?"

Orderly trial procedure requires that a party who has not opened his own case will not be permitted to introduce affirmative defenses to the jury by cross-examination of witnesses of the adverse party. Hogen v. Klabo, 13 ND 319, 100 NW 847. These questions would have been proper if asked of the witness if he had been called for cross-examination under the statute as a part of the defendants' case. They appear in this record, however, as a part of the cross-examination conducted during the plaintiffs' presentation of their case. The questions pertain to a breach of the contract by the plaintiffs, a matter which was pleaded as a defense. It was not an abuse of discretion of the trial judge to sustain objections thereto as improper cross-examination. In fact, he is to be commended for applying a rule of orderly procedure in a case which involves many complicated and confusing aspects.

The contract, as construed by the parties, provided that checks issued by the plaintiffs in the name of Irving's Tractor Lug Company were required to be countersigned by one of the defendants. It stated that:

"The sellers may not refuse to countersign any check arbitrarily or capriciously so long as the check is issued for a proper business purpose."

Plaintiffs' second cause of action charges the defendants with violation of this provision. The plaintiffs introduced in evidence two checks drawn on the Dakota National Bank, dated November 18, 1950, for $60.00 each, payable to C. Mevorah and Martin A. Sills, respectively. The checks represented amounts which the parties agreed the plaintiffs might draw personally from the business. There is no contention that they were not issued for a proper business purpose. Irving Goodman had testified that he countersigned every check presented to him when there was money in the bank to meet it. Thus it became important to establish whether on November 18, 1950, when Irving Goodman refused to countersign the checks to Mevorah and Sills, there was money in the bank to meet them. The plaintiffs produced a letter, exhibit 77, dated November 18, 1950, purporting to be written by A. M. Eriksmoon, cashier of the Dakota National Bank, which the cashier gave to the plaintiffs. Sills testified that he showed the letter to Goodman at the time of and in connection with his request that Goodman countersign the two checks. The letter is addressed to Irving's Tractor Lug Company and states:

"This is to advise you that the balance of your checking account as of the close of business November 17, 1950, amounted to $714.29. A deposit of $89.42 was made on November 18, 1950, which will make your balance $803.71."

This letter was admitted in evidence over the vigorous objection of defendants' counsel that it was not the best evidence and that it was hearsay and that no foundation was laid for it. The further objection was made that the letter showed the bank balance but did not show what the balance would be after the deduction of outstanding checks. This letter was subject to all of the objections made to it. It was not the best evidence of the bank balance, the records of the bank itself being the best evidence of that fact. If it is to be construed to state what books of the bank showed, it is also hearsay. Furthermore, there was an entire absence of foundation in that there is no evidence of the functions of the cashier, if any, with respect to or knowledge of the balances of the bank's depositors. In fact, the letter does not purport to state that the information

therein contained was obtained from the bank records. Whether there was money enough in the bank to pay these two checks and any outstanding checks that might have been previously countersigned was an important issue under plaintiffs' second cause of action. The trial court erred in admitting the letter in evidence over objection.

The witness Conoboy was called by the defendants. He was a certified public accountant of considerable experience who had examined the books and accounts of Irving's Tractor Lug Company during the period it was operated by the plaintiffs up to the close of business February 3, 1951. He was permitted to testify in detail as to the facts which he found during the audit. He stated that there were 409 invoices that were missing and unaccounted for in any manner, whereupon he was asked these questions to which objections were sustained:

"In your long years of experience as a certified public accountant, Mr. Conoboy, will you tell me in your accounting experience normally what that large number of missing invoices would mean?"

"And what would be your opinion as to why they are missing?"

At another time during this witness's testimony he pointed out errors or discrepancies in the books and accounts and was then asked:

"Now, does this or does it not tend to show a juggling of accounts?"

The defendants specify as error the refusal of the trial court to permit these questions to be answered and cite Wishek v. United States Fidelity & Guaranty Co., 55 ND 321, 213 NW 488, wherein this court said:

"The rule is that in those cases where it is impracticable or impossible for the court to make an examination of a large number of instruments, entries or records, a competent witness may make such examination and present his conclusions thereon to the court."

The rule thus stated is not sufficiently broad to cover the questions propounded in this instance. It is obvious from these questions that they were intended to draw from the witness conclusions of intent, motive, or purpose of the persons handling

the books or accounts or operating the business. · Such conclusions, if they are to be drawn at all, are for the jury and not for the witness, be he ever so expert an accountant. This becomes obvious when we consider the reason for permitting an accountant or auditor to give conclusions with respect to his examination.

Books and accounts are the best evidence of what is contained therein. Dr. R. D. Eaton Chemical Co. v. Doherty, 31 ND 175, 153 NW 966; Great Western Life Assurance Co. v. Shumway, 25 ND 268, 141 NW 479. The rule stated in Wishek v. United States Fidelity & Guaranty Co., supra, is one of convenience which permits an expert to assist the court and jury by summarizing and pointing out salient facts which are different to ascertain because of voluminous figures and documents and intricate details of accounting. Linnell v. London & Lancashire Indemnity Co., 74 ND 379, 22 NW2d 203. The accountant or auditor so permitted to testify does not become an expert for the purpose of testifying to conclusions outside of the strict scope of his business or profession. His conclusions may not invade the province of the jury where the jury is competent and qualified to draw its own conclusions. The testimony sought to be elicited by inquiries here under consideration called for determinations exclusively within the province of the jury. The trial court did not err in this respect. See annotations in 135 ALR 1145; 52 ALR 1268; Shreve v. United States, 77 Fed2d 2.

The witness Conoboy testified that at the end of business on February 3, 1951, there was an overdraft of $116.76 in the bank account of Irving's Tractor Lug Company in the Dakota National Bank. The plaintiffs were contending that the refusal of the defendants to countersign checks on this account constituted violations of the contract. On the other hand, the defendants were contending that they countersigned all checks when they did not result in overdrafts. The evidence shows that the plaintiffs maintained another account in the same bank in the name of Irving's Tractor Lug Company which was known and designated as a special account. The defendants testified that they knew nothing about this special account and it seems clear that in any event the defendants were not required to and did not countersign checks on this account. The witness Cono-

boy, on cross-examination, testified that there was $1074.42 in the special account. He was then asked:

"So that, allowing for the $116.76 so-called overdraft in the regular account there was at least $900 to spare to take into account with the special account, wasn't there?"

Over the objection that this evidence was immaterial, the witness was allowed to answer: "Yes. There would be a $900 net."

The next question which the witness was permitted to answer over objection was:

"Do you know of any reason why Mevorah and Sills couldn't transfer funds from the special account to the general account?"

And the witness answered: "No. I know of no reason." This testimony was clearly immaterial and improper cross-examination. The issue at this point was whether the defendants breached the contract by refusing to countersign checks on the regular account which the witness had testified was overdrawn. Arbitrary or capricious refusal was a breach of the terms of the contract. It is clear that whether or not there was money in a special account was immaterial. The injection of evidence of the special account over which the defendants had no control could only confuse the jury.

On direct examination the witness Conoboy testified that his audit showed that moneys to the extent of $2100.00 had been received for parts, the parts not shipped, and the money not refunded. The audit covered the time the business was operated by the plaintiffs up to the close of business February 3, 1951. The business was repossessed by the defendants on February 5, 1951. On cross-examination the fact was emphasized that, having lost control of the business, the plaintiffs could not fill orders after February 5, 1951. Upon redirect examination counsel for defendants sought to counteract the implication that the unfilled orders had been received shortly prior to the time the business was repossessed and that the plaintiffs had not had an opportunity to fill them. After some preliminary colloquy between the lawyers and the court, the following took place:

"*Mr. Lanier:* Mr. Conoboy, from your examination of the books of Mevorah and Sills, of the invoices, of the daily cash

reports, of the letters of complaint, could you ascertain generally speaking when these orders upon which the complaints were made on which no money was refunded, when they came in? Answer yes or no.

"A. Yes.

"Q. Could you tell me what period of time they covered?

"*Mr. Conmy*: If the court please, I object to that as not the best evidence and entirely immaterial to the issues in this case.

"*The court*: I think I will sustain the objection."

The court later permitted the defendants to introduce exhibits 513, 514, 515, and 516 containing some 1,000 instruments in the form of orders or invoices which presumably contained the information sought to be elicited from the accountant Conoboy. The court should have permitted the witness to answer the question which was one of fact peculiarly within the knowledge and experience of the witness. It called for an answer which could be obtained only by the examination of a large volume of papers. The question called not for a conclusion but for a statement of fact, knowledge of which the witness presumably had already acquired and which the jury could otherwise acquire only by a detailed examination of numerous documents which could not be conveniently examined in court. See Linnell v. London & Lancashire Indemnity Co., 74 ND 379, 22 NW2d 203. The court erred in sustaining the objection.

The defendants complain of rulings of the trial court sustaining objections to questions put to the defendant, Stanley Goodman, on direct examination regarding a subsequent oral agreement between the plaintiffs and defendants as to the conduct of the scrap metal business by the defendants. We find no error here and, if the court had erred in this respect, the error would have been cured by testimony this defendant subsequently gave, as follows:

"*Mr. Lanier*: After this contract was entered into and after Mevorah and Sills took over on July 1, 1950, did you have any further oral understanding with them?

"A. Yes, sir.

"Q. Did you have any oral understanding with them as to your conducting a scrap metal business?

"A. Yes. . . .

"Q. Was there any conversation between you and Mevorah and Sills as to conducting and purchasing scrap metal in the name of Irving's Tractor Lug Company?

"A. Yes, sir.

"Q. Where did that conversation take place and why?

"A. It took place in the office and also in the yard."

The witness was not asked to repeat the conversation referred to in this testimony. Counsel left the details to inference.

The defendants contend that the court erred in sustaining an objection to this question:

"Now, Irving, at the time of entering into this agreement with Mevorah and Sills, was there ever any discussion and conversation between you and Mevorah and Sills as to outstanding credit memos?"

The court did not err in sustaining the objection. Whether there was such a conversation or not was wholly immaterial and, if it were sought thereby to vary the terms of the written contract, the testimony would have been improper. Section 9-0607 NDRC 1943 provides:

"The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument."

"Where a written contract is complete in itself, is clear and unambiguous in its language and contains mutual contractual covenants agreed upon, such parts cannot be changed by parol testimony, nor new terms added thereto, in the absence of a clear showing of fraud, mistake or accident." Larson v. Wood, 75 ND 9, 25 NW2d 100.

The contract contained this provision:

"The buyers shall have the right to buy out of stock parts and parts not included in the inventory for their own account. On the sale of all such parts, the buyers shall pay to the sellers 10% of the sales price to apply on the obligation of the promissory note."

On redirect examination of the plaintiff Mevorah it was brought out that at the time the stock of goods was repossessed by the defendants there were included therein items of merchandise in the inventory that had been paid for by the plaintiffs. The witness also testified that merchandise bought on plaintiffs' account came to the place of business after the repossession. The witness was then asked:

"Now, how much merchandise that you bought on your own account with your own money, if you know in value, was there when they kicked you out?"

Defendants' attorney objected on the ground that the question was improper surrebuttal and immaterial. The objection was overruled and the witness answered:

"There was between four and five thousand dollars in merchandise cost price."

This is an action for damages for breach of contract. There are no allegations in the complaint with reference to new merchandise other than that the defendants "mingled new merchandise bought by the plaintiffs on their own account with the old merchandise sold conditionally to these plaintiffs." Repossession is not alleged and no damages are sought in connection therewith. If, as Mevorah testifies, the Goodmans, when they repossessed the stock covered by their conditional sales contract, also seized other goods that was the property of the plaintiffs, the value of that property is wholly immaterial in this action. It bore no relation to the amount of damages that might be recovered for breach of contract. The admission of this evidence was error that might well have misled the jury in determining the amount of damages.

Counsel for defendants predicates error upon the denial of two motions for a declaration of mistrial. We will consider them together. The first motion was made following the asking of this question of the defendant, Stanley Goodman:

"I am going to ask you, if as a matter of fact, you were ever adjudged guilty of the crime of criminal contempt of court?"

An objection was sustained, but counsel for the defendants nevertheless contends that it was prejudicial conduct on the part of plaintiffs' counsel to ask the question and the court therefore

should have granted a mistrial. The second motion for a mistrial grew out of this situation that developed during the cross-examination of Irving Goodman:

"Mr. Goodman, you were telling us about this Frankenburger who was convicted with you there back in Illinois, weren't you?
"A. Yes. . . .
"Mr. Conmy: As a matter of fact, Mr. Goodman, after this affair which you have chosen to explain to us this morning in regard to this crime, Mr. Frankenburger, the cashier, committed suicide, didn't he?"

Defendants' counsel then moved for a mistrial. After comments by counsel for both sides, the court said:
"I will sustain the objection as to that testimony on the cross-examination of this witness. Because I think we are getting into a collateral issue here which we have gone far enough into. And I will deny the motion for a new trial."
After further comment by counsel for the defendants, the court said:
"I have sustained the objection. The jury in following the instructions of the court should bear in mind that where objections are made to questions and testimony and those objections are sustained, that the jury should eliminate and withhold consideration of such matters. It is only the admitted testimony that should be considered by the jury. And the statements of counsel are not testimony."
The question was highly improper.

Chapter 27-10 NDRC 1943 sets forth the acts that may be punished as criminal contempts and those that may be punished as civil contempts, prescribes the punishment in each instance, the method of apprehension, trial, and appeal to the supreme court. The trial procedure prescribed for civil and criminal contempt is the same. Section 27-1013 NDRC 1943. No jury trial is provided for in either case. The court alone determines whether the accused has committed the offense charged and makes an order prescribing punishment within the limits provided by the statute. Section 27-1017 provides that a person who is punished for contempt may also be prosecuted criminally

for the same conduct if it is a public offense, but the court, in such a case, is required to take into consideration the previous punishments. Section 12–1725 NDRC 1943 provides that a criminal act is not the less punishable as a crime because it is also declared to be punishable as contempt. But the court, authorized to pass sentence, may mitigate the punishment to be imposed in its discretion. These statutes make no distinction between civil and criminal contempts.

Contempt proceedings are generally classified as neither civil nor criminal but sui generis. 17 CJS, Contempt, Section 62; 12 Am Jur, Contempt, Sections 66 and 75. This court has held that contempt proceedings are quasi criminal in character. State v. Babcock, 64 ND 288,.251 NW 849; State v. Harris, 14 ND 501, 105 NW 621.

In Niemeyer v. McCarty, 221 Ind 688, 51 NE2d 365, 154 ALR 115, it was held that the trial court properly sustained an objection to the introduction in evidence of certain records of a contempt proceeding in which it was said that the plaintiff was convicted of contempt of court for perjury. This evidence was offered for the purpose of affecting the credibility of the plaintiff as a witness. The basis for the holding, as the court stated, was that contempt of court is not a crime, although the same act may be a crime and may also be contempt of court.

In Farrell v. Phillips, 140 Wis 611, 123 NW 117, the court held that it was error to admit for purposes of impeachment the record of the prior conviction and fine of the witness for contempt of court. One of the reasons given for this holding is that:

"conviction of a contempt of court, either civil or criminal, is not a conviction of a 'criminal offense,' as very plainly appears from the provisions of sec. 2569, Stats (1898), which expressly provides that persons punished for contempt even criminally shall still be liable to indictment or information for the offense."

It is clear to us that the question propounded to the witness, Stanley Goodman, in an effort to test his credibility does not come within the rule that permits a cross-examiner to inquire whether or not the witness has been convicted of crime. See

Engstrom v. Nelson, 41 ND 530, 171 NW 90; State v. Bossart, 62 ND 11, 241 NW 78, and cases cited therein.

The defendants by moving for a mistrial after the ruling of the court in each instance took the steps to protect the record that was approved by this court in Stoskoff v. Wicklund, 49 ND 708, 193 NW 312. The question here is whether the asking of the questions created prejudicial error although objections to the questions were sustained.

Every offer of improper evidence does not require a reversal. The ultimate question is whether the offer of the evidence was itself prejudicial despite the ruling of the court. Much depends upon the importance and character of the evidence and the circumstances under which it was offered. A collection of cases on the improper offer of evidence is found in an annotation in 109 ALR 1089. The first question was asked upon the recross-examination of Stanley Goodman, one of the defendants. The question itself was a misstatement of the law in that it required the witness to state whether he ever had been adjudged guilty of the *crime* of criminal contempt of court, thus intimating that the witness had been guilty of a crime which in law did not exist. The second question under consideration was propounded to the defendant, Irving Goodman. The answer could have no bearing on the credibility of the witness. We do not believe that prejudice was alleviated by the subsequent instruction and comments of the court or the further testimony of the witness in effect denying the suicide. We have here a situation where the defendants, father and son, were co-partners. An improper question was asked of one, implying that he had been guilty of the *crime* of criminal contempt of court. A question was asked of the other defendant assuming that he had been guilty of a crime that was so heinous that another man connected with that crime had committed suicide. These questions were prejudicial and when considered together have the cumulative effect of reversible error. Our conclusion that there must be a new trial in the interests of justice is further accentuated by other errors to which we have already referred.

The specifications of error also cover other points dealing

with the court's ruling on the admission of evidence, but none of them are of sufficient merit or importance to require consideration here.

Several specifications of error are based upon instructions given by the trial court or requested instructions by him denied. One situation is presented which requires discussion and clarification in view of the fact that the same question is likely to arise on a new trial.

Paragraph H of the contract contains these provisions:

"H. Sellers not to Compete.

"1. The sellers agree that they will not engage, directly or indirectly in the retail or wholesale business of the sale of new tractor and farm implement parts in the buyers normal trade territory of Wichita, Kansas, Portal, North Dakota, or Fargo, North Dakota, nor engage in foreign export of said items, for a period of 15 years from the date hereof.

"2. If, and at such time as the buyers may purchase the sellers' entire stock of usable 'used' parts in accordance with the buyers option stated herein, the sellers after said sale hereby agree that they will not engage, directly or indirectly, in the retail or wholesale business of the sale of used and reconditioned tractor and farm implement parts in the buyers normal trade territory of Wichita, Kansas, Portal, North Dakota, or Fargo, North Dakota, nor engage in the foreign export of said items, for a period of 15 years after said sale.

"3. The sellers agree that they shall not conduct any other business in the name Irving's Tractor Lug Company.

"4. Violation of this covenant (Par. H) shall subject the sellers to pay the buyers the sum of $10,000.00 as and for liquidated damages."

After quoting sections 3 and 4 of Paragraph H above, the trial court said to the jury:

"You are therefore instructed that if you find from the evidence in this case that the defendants have conducted any business in the name of Irving's Tractor Lug Company since the contract has been in operation, and if you find that there are damages sustained by the plaintiffs for which it would be

impractical or extremely difficult to fix the actual damage then in that event the plaintiffs are entitled to recover on their cause of action claiming violation of the contract in the use of the trade name the sum of $10,000, as and for liquidated damages for the breach of the specific covenant concerned."

The defendants argue that the court erred in permitting the jury to consider the matter of liquidated damages upon the violation of the provision regarding conducting business in the name of Irving's Tractor Lug Company. They argue that the purpose of Paragraph H was to prevent the defendants from entering into competition with the plaintiffs and that without evidence of such competition the liquidated damage provision cannot be applied. The instruction given was erroneous for reasons akin to those urged by defendants' counsel.

Section 9–0804 NDRC 1943 provides:

"Every contract by which the amount of damages to be paid, or other compensation to be made, for a breach of an obligation is determined in anticipation thereof is to that extent void, except that the parties may agree therein upon an amount presumed to be the damage sustained by a breach in cases where it would be impracticable or extremely difficult to fix the actual damage."

Of similar provisions in the South Dakota law, it is said in International Milling Co. v. Reierson, 55 SD 139, 225 NW 218:

"It is not apparent that these sections do, or were intended to, modify the common-law rule. If they do not, then the validity of such provision is to be determined by its character. If the provision can be said to provide only fair compensation for the loss incurred by the injured party, it is valid. But if it appears to provide a penalty in fact, although in the guise of damages, it is void. If the damages contracted to be paid are in fact fair and compensatory only, then the provision should be enforced."

An examination of section 1 of Paragraph H of the contract above quoted discloses that the sellers agree not to engage in foreign export of certain items or engage in certain types of business within a definite territory for a period of 15 years. Such provisions are generally held to be a proper basis for contracting for a reasonable and definite sum as liquidated

damages. Berghuis v. Schultz, 119 Minn 87, 137 NW 201; Kelso v. Reid, 145 Pa 606, 23 Atl 323, 27 Am St Rep 716. The second section of Paragraph H is much like the first except that its restrictions are conditional. However, it is not for a violation of these provisions that the plaintiffs seek damages in this action. Recovery is sought under the provision that the sellers agree that they shall not conduct any other business in the name of Irving's Tractor Lug Company. This provision, if taken alone and separate from that which goes before, would seem to give the right of recovery of $10,000.00 against the sellers if they conducted a non-competing business in the forbidden name, regardless of the location, kind of business, and the amount of damages inflicted. This appears to be the construction given this provision by the plaintiffs and by the court in his instructions. As so construed, it is a drastic provision which bears the earmarks of a penalty rather than liquidated damages. If section 3 is wholly independent of the two sections which precede it and is given the construction placed upon it by the plaintiffs and the court which permits recovery for violation of section 3 as a separate and independent covenant, the provision for liquidated damages is void as a gross penalty provided for breaches of the whole of Paragraph H and of each of its separate provisions which vary materially in import and importance.

In Raymond v. Edelbrock, 15 ND 231, 107 NW 194, it is said:

"It will be observed that the plaintiff is seeking to recover damages for only a partial breach of the contract. The defendants sent to plaintiff within the time prescribed the required amount of claims for collection, but failed to send the specified number. By the terms of the contract the defendants promised to pay $36 'as liquidated damages' if they failed 'to comply with this agreement.' If this language is to be construed to mean that the stipulated sum was to be the measure of damages for a breach of any of the stated conditions, then the pretended liquidation of damages was a mere agreement for a penalty; and the entire stipulation would be void for familiar reasons. Where a contract stipulates for the performance of several acts and fixes the same amount of damages for the nonperform-

ance of any single minor condition as is fixed for a total breach, regardless of the relative detriment apt to result from such partial breach as compared to the loss for a total breach, the very terms of the contract itself demonstrate that compensation for actual detriment was not the thought of the parties. If the agreement is not for compensation it is necessarily one for a penalty."

In Henry v. Louisville & N. R. Co., 91 Ala 585, 8 So 343, it is said:

"Agreements sometimes contain more stipulations than one, and then express a promise to pay a gross sum, on the breach of such agreement. The sum thus expressed and promised is treated as the agreed compensation, or recoverable damages, for an entire breach of all the stipulations, and, hence, not recoverable in gross for a partial breach, and consequently are not liquidated damages; . . . ."

In 15 Am Jur, Damages, Section 253, it is said:

"It is a rule in many jurisdictions that where a contract contains several covenants of different degrees of importance and the sum named is to be paid for the breach of any of them, even the least, it will be treated as a penalty, notwithstanding such sum is termed 'liquidated damages,' and, it has been said, the language of the parties is the strongest which could be employed to evince a contrary intention."

In 25 C. J. S., Damages, Section 111, we find these statements:

"As a general rule a sum stated as the damages to be paid for the breach of a contract containing several distinct and independent covenants upon which there may be several breaches will be considered a penalty and not liquidated damages. . . .

"The rule that a stipulated sum in gross to be paid on the breach of a contract for the performance of several conditions is a penalty is especially applicable where the different acts to be performed are of varying degrees of importance, although such fact is not controlling in all cases."

Discussions of this question may also be found in Sutherland on Damages, 4th Edition, Section 294; Williston on Contracts,

Revised Edition, Section 784; Sedgwick on Damages, 9th Edition, Section 413. See note LRA1915E 374.

Paragraph H which is headed "Sellers not to Compete" must be construed as a whole in furtherance of the purpose expressed in the heading. The provision for liquidated damages does not purport to apply separately to each provision but to Paragraph H generally. It refers to "violation of this covenant." The exact meaning in this respect is somewhat obscure and may be said to be ambiguous. But it may be presumed that the parties intended to make a valid agreement and one not violative of an express statute. The statute is not violated if Paragraph H is construed to provide liquidated damages for the use of the name Irving's Tractor Lug Company in connection with any other business in which the defendants are forbidden to compete under the terms of the first two sections of the paragraph. This would in effect result in liquidated damages being applicable only in breaches involving the contract as a whole and not to a breach, if so it might be termed, resulting from the use of the name Irving's Tractor Lug Company in a wholly non-competing business.

In Raymond v. Edelbrock, 15 ND 231, 107 NW 194, from which we have already quoted, the court reached the conclusion that:

"The stipulation fixing the amount of damages in case of a total breach having no application to the partial breach shown in this case, it was incumbent upon the plaintiff to prove the extent of his loss if he would recover more than a nominal amount."

In this case the court erred in instructing the jury to return a verdict of $10,000.00 in event they determined that the defendants have conducted any business in the name of Irving's Tractor Lug Company, since the contract had been in operation, if the plaintiffs had sustained damages that would be impracticable or extremely difficult to fix.

Other questions raised regarding instructions are without merit and do not require that this opinion be further prolonged by their consideration.

The judgment appealed from is reversed because of the errors herein noted and a new trial is granted.

BURKE, SATHRE, CHRISTIANSON and GRIMSON, JJ., concur.