302 So.2d 751 (1974)
Erle W. McGOUGH, Petitioner,
v.
STATE of Florida, Respondent.
No. 45592.
Supreme Court of Florida.
October 28, 1974.
Rehearing Denied November 27, 1974.
*752 E.B. Larkin of Larkin, Larkin & Waller, Dade City, and Charlie Luckie, Jr. and Charles W. Pittman, of MacFarlane, Ferguson, Allison & Kelly, Tampa, for petitioner.
Robert L. Shevin, Atty. Gen., and Charles Corces, Jr., Asst. Atty. Gen., for respondent.
PER CURIAM.
This cause seeking conflict certiorari review arises as the result of petitioner's conviction on seven counts of grand larceny, allegedly during the years 1970-1971, and the affirmance of such convictions by the Second District Court of Appeal. McGough v. State, Fla.App. 1974, 293 So.2d 147. We take jurisdiction under Art. V, Sec. 3(b)(3), Florida Constitution.
The convictions resulted, in capsule form, from the following salient facts garnered from the District Court of Appeal's opinion. The records of an automobile agency, owned by a Mr. Timmons, demontrated that over the years the agency had created a reserve fund containing various amounts which ostensibly arose from petitioner's purchase of vehicles for a Co-op in which he was the general manager. The reserve funds were then used by the agency as deductions, plus the trade-in values on older automobiles of the petitioner, in the purchase price of automobiles purchased by petitioner for his personal use. In fact, these amounts were not deducted from the prices paid by the Co-op, but were deducted from the amounts otherwise due to the agency from the petitioner for the purchase of his own automobiles. The evidence also established that the Co-op called for numerous bids.
In an attempt to establish its case, the State adduced testimony of Mr. Brooks, a former owner of the agency (1959-1966) to the effect that the petitioner had an "understanding" with him that certain monies would be deducted from the sales price of various automobiles purchased for the Co-op, and that these funds were to be credited to the petitioner upon his subsequent purchases of personal automobiles. No evidence was introduced to establish that this policy, if in fact such existed, would continue subsequent to 1966. Indeed, Mr. Timmons, the then owner (1970-1971), his bookkeeper and the petitioner *753 all denied any criminal arrangement between the agency and the petitioner.
In the McGough opinion, supra, at 149 the District Court stated:
"The defendant insists, however, that although this evidence may have established that Timmons and McGough were involved in a kind of payola, it did not, as circumstantial evidence such as this must, exclude a reasonable hypothesis that he was not guilty of larceny from the Co-op, the crime with which he was charged; that is, that he did not know that it was the Co-op's money which was being used to supply him with inordinately inexpensive, or free, personal vehicles. If this were all the evidence, despite its overwhelming suspiciousness, McGough might be right." (Emphasis supplied.)
The State, however, relies on the testimony of the former owner (1959-1966) to predicate and preserve the finding of guilt.
Naturally, we must now first direct our attention to the case as a whole.
The transcript of testimony, however, unravels the backlash created in this case. Mr. Pershing, the bookkeeper for the agency from January, 1967 to February 1, 1971, (called as the State's witness), in accordance with standard practices of Ford Motor Company, set up a reserve or general account, primarily designed for "fleet" accounts, i.e., big customers, which included company executives.
Into this master reserve account various sums were credited. These were assigned from the "agency's profit from sales", if any. In the automobile retail sales business this was considered to be a reduction of profit to the agency.
Subsidiary accounts from the master reserve were then established which contained numerous names, including among others those of the petitioner as well as the Co-op. Sums allocated to the master reserve were in turn then allocated to the various subsidiaries.
Mr. Pershing did not receive instructions to establish this procedure, but, due to his many years of bookkeeping in automobile retail sales, proceeded in customary manner and practice to so arrange it. In this type of business, this method was employed for the convenience of good customers and came from the profits of the agency, with each allocation being determined by Mr. Pershing. It also had the effect of simplifying records and assisted in the preparation of the agency's profit and/or loss statements since ultimately the reserve fund would be credited as a discount on any future purchase by the designee.
Mr. Pershing never discussed this procedure with the petitioner because it was not an unusual practice. In fact, considerable bargaining accompanied the purchase price of new cars when consideration was given to the listed sales price and trade-in value of older cars. A new car was always sold less than its listed retail price.
The accounts in question clearly revealed the discounts allocated to petitioner to be deductions from "profits" of the agency and not coming from any overcharge to the Co-op. In fact, the agency's "average" profit, per unit sale, ranged from approximately $800 to $274.
Petitioner, as vice-president and general manager of the. Co-op over numerous years, had absolute authority to purchase vehicles from whomsoever he desired. He performed his duties well and advised the Co-op's board of all matters. Apparently, no problems occurred until 1971.
Of the seven larceny counts surrounding petitioner's allocated discounts during 1970-1971, these totalled approximately $3,378.35 and were credited as discounts, less trade-in allowances, on the purchase price of two automobiles, leaving a balance of approximately $1,200.00. This sum was still owed by petitioner at time of trial.
*754 It also clearly appears that over previous years the petitioner had purchased numerous personal vehicles from the agency, receiving a trade-in allowance for his vehicles, and had paid the difference either by check or cash with no "discount" allowance given.
The owner of the agency, Mr. Timmons, who had been in the retail automobile business for many years, substantiated the testimony of Mr. Pershing and negated the inference that any allotted discount came from the Co-op's funds, but, to the contrary, that the discounts were credited from his agency's profits in the usual course of events. He expressly refuted any "deal", "design" or "scheme" with the petitioner to steal from or overcharge the Co-op. He insisted that the procedure used was the agency's internal business routine.
Finally, in rebuttal to Mr. Brooks' testimony relative to 1959-1966, Mr. Albert A. McKeathern, former Chairman of the State Road Department, former member of the Florida Citrus Commission and former Chairman of the Southwest Florida Water Management District (and a friend of both Brooks and the petitioner) testified that as a result of various comments and publicity he discussed the problem with Brooks prior to the petitioner's trial and that Brooks told him he had never made any "deal" with the petitioner over automobiles. This obviously contradicts Brooks' testimony and extends serious incredibility to it.
Thus, in considering the entire testimony under miscroscopic review, we can only conclude that it falls short of proving guilt of larceny beyond every reasonable doubt since the essential elements of knowledge and intent are conspiciously lacking to establish this degree of proof. For this reason, the case must, of necessity, fall.
However, let us also direct our attention to Mr. Brooks' testimony. Was this former owner's statements, relative only to 1959-1966, too remote in time to the alleged events of 1970-1971. We believe it was.
While recognizing that Williams v. State, 110 So.2d 654 (Fla. 1959) permits the admissibility into evidence of a prior crime for the relevant purpose of establishing knowledge and intent, we also note that in Williams, supra, the prior crime occurred only some six weeks before the one charged. Therefore, such proof was not only relevant but the prior crime had been committed within a reasonable space of time prior to the one charged.
In McGough, supra, 293 So.2d at 149, via footnote, the District Court of Appeal opined:
"... The fact that these crimes occurred some years before those charged in the informations in question does not affect their admissibility."
We cannot agree, because to do so would do violence to basic and rudimentary principles of law of this State.
Naturally, relevancy is a test, however, it is not the sole criterion for admissibility of a prior crime, and timeliness is a part of the test of relevancy.
In the case under review, some four years had elapsed between the events testified to by the agency's former owner and the acts charged against the petitioner in the information.
The "time" factor and its relationship to relevancy has been treated on numerous occasions in this State. Therefore it is subject to appropriate discussion in this cause.
"... [T]he charge here under consideration may be committed by a single act or it may be committed by successive acts of the same character extending over a period of time not exceeding the statute of limitations."
Then, in Bronson v. State, 117 Fla. 828, 158 So. 435 (1935), our Court, in reversing *755 and concluding that even though the evidence appeared strong and convincing against the defendant, nevertheless found reversible error when the trial court permitted testimony of a similar crime "at a time long prior to the commission of the offense for which he was being tried."
In a rape trial, Gluck v. State, 62 So.2d 71 (Fla. 1952), our Court found it improper to admit testimony of an alleged victim of the defendant to the effect that she had been attacked some three or four years before the crime charged.
The Second District Court of Appeal in Farnell v. State, Fla.App. 1968, 214 So.2d 753, 761, stated:
"From the record, the evidence here was apparently admitted on the theory that `it demonstrated a plan or pattern followed by the accused'. But reaching back to 1956 and 1957 to show a scheme or pattern for violating the law was prejudicially unnecessary, the same as if beating on a lame horse."
The Fourth District Court of Appeal in Reed v. State, Fla.App. 1969, 224 So.2d 364, 365, also recognized the importance of "timeliness" by stating:
"It is well settled that relevant evidence of similar crimes committed within a reasonable space in time are admissible to show an intent, motive or pattern of criminalty." (Emphasis supplied.)
The conclusion, therefore, is easily drawn that "remote" crimes are not "relevant" evidence. Thus, was the testimony of the agency's former owner too remote in time to be admissible? We conclude that it was. Upon this determination, even the Second District Court of Appeal would have concluded in effect that the State "had no case". So do we. Additionally, we observe that, if in fact a crime had occurred with Brooks, it would not necessarily be relevant to establish that a crime had also occurred with Timmons some four years later. Therefore, the scheme or pattern doctrine unacceptable in Gluck, supra, applies here.
By exclusion of the former owner's testimony, the record does not contain anything to prove that petitioner knew that he, as manager of the Co-op, was overpaying for automobiles (in fact he was not) and that such overpayments, if any, were being credited to him for personal future purchases. Thus, knowledge and intent are lacking, and these are essential elements of the crime of larceny. Where an attempt is made by the State to prove such through circumstantial evidence, such proof must not only be consistent with guilt but also inconsistent with any other reasonable hypothesis of innocence. Lockett v. State, Fla.App. 1972, 262 So.2d 253; Mayo v. State, 71 So.2d 899 (Fla. 1954); Masters v. State, 159 Fla. 617, 32 So.2d 276 (1947). Probability cannot be the basis for guilt.
In the interest of justice, however, we will treat the remaining error urged by petitioner, that is, whether it was proper to permit an accountant's expert testimony, in the nature of a conclusion, that the reserve account on the agency's books essentially "belonged" to the Co-op. This constituted prejudicial error. The testimony was introduced as a part of the State's case in chief, and related to ownership of the agency's profits. It was not limited in competency to sound accounting procedures, nor did it clear up obscure facts. When facts are within the ordinary experience of jurors, conclusions to be drawn therefrom are to be left to those jurors. Smaglick v. Jersey Insurance Company of New York, Fla.App. 1968, 209 So.2d 475; Mevorah v. Goodman, 79 N.D. 443, 57 N.W.2d 600.
Accordingly, in this cause, the evidence falls short of that quality to prove guilt beyond reasonable doubt. For this reason the decision of the District Court of Appeal is quashed and this cause is remanded *756 with instructions to remand to the trial court with directions that the petitioner be discharged.
It is so ordered.
ADKINS, C.J., and ROBERTS, McCAIN and DEKLE, JJ., concur.
OVERTON, J., dissents with opinion.
OVERTON, Justice (dissenting).
It is my opinion that conflict jurisdiction has been improperly invoked.
On the merits, I fully agree with the explicit opinion of the District Court. The evidence, deemed by the majority to be remote in time, clearly establishes a material course of conduct by the petitioner-defendant. Four years does not make it remote, because it bears a direct relationship to the crime charged and is therefore relevant to establish knowledge and intent.
The writ should be discharged.