(97 N. W. Rep. 850.)

---

O. A. BRASETH AND LINDORUS PRATT, COPARTNERS AS O. A. BRASETH & CO., v. THE STATE BANK OF EDINBURG, N. D., A CORPORATION.

Opinion filed January 7, 1904.

**Contract—Action for Breach—Substantial Performance.**

1. Before a contractor is entitled to recover on his contract, not fully complied with as to the work done or materials used, on the principle of substantial performance, he must show not only that he endeavored in good faith to comply with the contract, but has complied with it except as to unimportant matters susceptible of remedy without material injury to the other parts of the building. Failure to perform the contract, or omissions or deviations from it, must be through mistake or inadvertence, and not intentional, and not such as to result in giving the owner a building different from the one contracted for in substantial matters. *Anderson* v. *Todd,* 77 N. W. 599, 8 N. D. 158, followed.

**Same.**

2. Where defects or omissions or deviations from the contract pervade the work on the whole building, the contractor cannot recover on the theory of substantial performance.

**Evidence.**

3. Evidence examined, and *held* not to warrant a recovery on the contract as substantially performed.

Appeal from District Court, Walsh county; *Kneeshaw, J.*

Action by O. A. Braseth and Lindorus Pratt against the State Bank of Edinburg, N. D. Judgment for defendant, and plaintiffs appeal.

Affirmed.

*B. G. Skulason,* for appellants.

*H. A. Libby,·* for respondent.

MORGAN, J. This is an action to foreclose a mechanic's lien filed by the plaintiffs against defendant's bank building in Edinburg, N. D. The plaintiffs erected the bank building under a contract embodying in it the plans and specifications. The amount claimed to be due on the contract price, $2,918, is the sum of $1,097.95. Extra work was done on the foundation and building in the sum of $221.69, which has also been paid for. The answer alleges that the·contract was not performed in substantial compliance therewith, that it was deviated from intentionally, and that the building was erected in such an improper and defective manner and with such inferior materials that such defects cannot be remedied without material injury to the building in other ways. The defendant also pleads a counterclaim for damages on account of such defects in the building in the sum of $1,200. The trial court dismissed plaintiff's action, disallowed the counterclaim, and gave defendant its costs and disbursements. The appeal is from such judgment. Plaintiffs request a review of the entire case, under section 5630, Rev. Codes 1899.

Defects in the construction of the building are not denied by plaintiffs. There is no claim made by them that the contract was performed in all respects strictly according to its terms. They do claim, however, that the contract was substantially complied with, and that the deviations from the plans and specifications were unintentional, excusable, and capable of remedy, and that by allowing defendant damages for making some changes to make the building strictly conform to the plans the contract will be substantially performed, and defendant receive a building in every way as substantial as though the contract had been performed according to its letter. The defendant has pleaded many particulars in which the building does not conform to the specifications. In all, twelve variations are the subject of discussion in the arguments and are covered by the testimony. Some of these—in fact most

of them—will not be more than mentioned, as one of them will be decisive of the case in its present form. The contract provided that the plaintiff should have the use of the brick that were on the lot, out of which the former bank building on the lot had been built. The former building was burned, and these brick had gone through the fire. The contract provision as to this is: "The contractor receives all salvage of the burned building and may work in as much of the old brick as will be consistent with the brick work specifications of the original building. All the outer brick walls must be taken down and rebuilt," etc. The specifications for the former building provided that: "Brick work shall start from bottom of first floor joists as shown per section and shall be laid of well-burned, sound brick, laid in lime mortar having trowel-struck joints. * * * The best brick to be selected for all face work." It is admitted that the side walls are not trowel-struck, and it is a matter of conflicting testimony as to the extent of the use of "brick bats" in the outer and inner layers of the side walls. The plaintiffs attempt to justify the failure to trowel-strike the brickwork of the side walls in view of the following facts: The fire which destroyed the former bank building also destroyed the buildings adjacent thereto on each side. When the contract was entered into in this case, it was not known to the parties that these adjacent buildings were to be rebuilt. Subsequent to letting this contract, and before the brickwork on the bank building had been begun, these adjacent buildings were put up. They were frame buildings, and were speedily erected. The space between this bank building and the adjacent buildings was small. The space was not accurately measured, but the evidence shows that "it was four or five inches." On the part of the plaintiffs it is claimed that it is impossible to trowel-strike brickwork in so small a space. The defendant claims that it is easily done. The excuse urged by plaintiffs is that it could not be done, and therefore was not done. There is very convincing testimony that the walls could have been finished according to the specifications in this regard, without extra care in any great degree. An expert witness for the plaintiffs testified as follows on cross-examination: "Don't you think it is possible and quite easily done, to trowel-strike these brick, layer by layer? A. Not in a place like that. Q. Couldn't it be done? A. Why, not hardly, I don't believe. I am going to try it the first chance I get. Q. And can't you reach

down there and trowel-strike that without seeing it. A. Not very well. You have got to see it to know that you are hitting the joint. Q. I am not asking you as to how well you could do it. I am asking you if you could do it. A. Yes, sir. You could strike it." A witness for the defendant, testifying as an expert, said: "It could have been struck course by course, as they were laid up, very easily. Q. How close, or in how narrow a space, can you make a struck joint, with your trowel, by taking the work layer by layer? A.. Anywhere from one inch to two." This witness was thoroughly cross-examined on this subject, and his testimony remained unshaken that trowel-struck work could have been done on the side walls without much difficulty. The testimony of this witness is corroborated by that of two others. The court found that this brickwork could have been trowel-struck "by exercising a great degree of patience and taking much more time." We will dismiss this phase of the case by saying that the evidence convinces us that this work could have been done according to the contract, and that the failure to do so was intentional and inexcusable.

. The evidence is undisputed that the appearance of the building is injured by the failure to finish these walls properly, and is conflicting as to whether it affects the durability of the wall or its use so far as keeping out wind, rain, or snow, and in resisting fire is concerned. It is claimed that, so far as appearances are concerned, it is immaterial, as the adjacent buildings conceal the defects from casual observation. In considering whether the walls are affected so far as durability and usefulness or protection from the elements is concerned, the evidence as to the character of the brick used therein and the manner of laying them must be considered with the evidence as to failure to trowel-strike the work. The witnesses all agree that brick bats were used to some extent in the outer walls, and that the walls had holes in them. Some say many and some say few. Owing to the adjacent buildings preventing, the examination was impossible except from the tops of the adjacent buildings, and then it could only be made at most about two feet below the roofs of the adjacent buildings. But it is amply proven by a convincing preponderance of the evidence that the holes in the wall were quite numerous so far as the examination extended. We see no reason for holding that an examination of the whole walls would show an absence of holes in the unexamined part.

The failure to properly finish was intentional, and done for a purpose, and the purpose undoubtedly existed and was carried out as to the whole wall. It needs no evidence to convince any one that a wall with numerous holes in it is not substantially built, or that it is inadequate for the purposes for which built. One of the plaintiffs (Mr. Braseth) testifies that there were some holes in the walls, but a few only of much depth. He also testifies that some brick bats were used in the outer walls. Not one witness claims that there were no holes in the side walls. There is no conflict on this point. The conflict in the evidence relates to the question as to the number, and whether their presence is detrimental or affects the durability or the usefulness of the wall as protection. The evidence shows that the side walls, so far as they could be examined, contained many holes extending well into the wall. These were caused by the falling out of the mortar, caused by the improper setting of the brick in the mortar, and the failure to trowel-strike the mortar between the brick. Trowel-striking is described as drawing the trowel over the mortar after the brick is placed therein, resulting in cutting it off and smoothing and spreading it, so that the holes are closed up. The use of brick bats of all sizes in the side walls was general. Practically all the brick bats from the burned building were utilized. On reading the whole evidence, the conclusion is forced upon us that they were used to such an extent that the walls are not such walls in strength, durability, or protection purposes as they would have been if the specifications had been complied with. The contract limited the use of broken pieces of brick so that their use must be consistent with building a good wall. This provision was violated. It is claimed that the use of brick bats in the walls to a greater extent than permitted by the contract is not pleaded. The contract specified what kind of bricks should be used. The answer alleges that the plaintiffs used an inferior quality of brick in the walls. The evidence was received without objection.

It is claimed that the wall was not laid according to specifications by reason of the fact that the brick in the outside walls were not properly laid; that they were not laid evenly; that they were not in line; that the wall was, in consequence, wavy. The testimony is uncontradicted that the wall was not laid true to a line. The variation is given variously by different witnesses, the greatest variation being one inch. One witness testifies that the appearance of the

wall indicated that the brick was laid in a haphazard way, and are irregular so far as being in a line is concerned. Another describes them as "roughly laid, crooked to some extent, and not laid straight or to a line." Taking into consideration the holes in the outer walls, the lack of trowel-finishing work, the use of brick bats in the inner and outer tiers of the walls, the evidence convinces us that the walls up to the roofs of the adjacent buildings were not built in substantial compliance with the contract and specifications, and, in consequence thereof, the wall is not as good a wall in appearance, strength, or use as if built in accordance therewith. It cannot be made to accord with the specifications except by tearing it down and rebuilding. Hence the defect cannot be remedied as a matter of fact or as a matter of law. The trial court made this finding in respect to these walls: "By said contract it was stipulated and agreed that plaintiffs should have and own as their property all the debris left on said premises and resulting from the destruction of the former bank building, and that they had the right to use all of said debris which might be suitable and fit to go into a building in the construction of said building; that in making use of that portion of such debris known as 'brick bats,' the plaintiffs had a right to make use of all such in size down to half bricks only, but that as a matter of fact the plaintiffs used all of the old brick bats in the construction of the brick walls and rear end of said building, using brick bats in size three inches square; and that in the construction of said walls of the new building the plaintiffs used all of this class of material left over from the old building except the mortar; that the side walls and rear end of said building were not erected to the line; that the surface of the walls is very uneven, the brick being laid crooked, and large quantities of brick bats smaller in size than halves used in the construction of the side walls and rear end, and that the walls themselves are crooked and wavy, being out of plumb from one-quarter to one inch; the outside surface of the side walls was never trowel-struck finished, but that the mortar was thrown on to the brick and the brick set therein, * * * and the mortar pressed out and left hanging upon the outer surface of said walls; that said side walls for about fourteen feet down are full of holes." The evidence is conflicting as to whether the walls are good walls, so far as durability and use are concerned. The conflict is sharp and irreconcilable. The reasons given to support the conclusions of defendant's wit-

nesses seem to us much more cogent. The plaintiffs' witnesses were on the defensive to some degree during the cross-examinations. One witness makes this admission: "Of course, it (the wall) would not be as good as if it was filled, but I don't imagine that the heat could go through or harm the wall." We think it amply shown that these walls were not as good, in point of substance, as though they had been laid in strict accordance with the specifications. Hence the contract was not substantially performed. If not substantially performed, evidence that the building is a good one and as suitable for the purposes for which constructed is inadmissible. Such evidence is admissible only in cases of minor, unimportant matters susceptible of remedy. *Anderson* v. *Todd,* 77 N. W. 599, 8 N. D. 158. In that case the principle was established in this state that the contract can be relied on as a basis for recovery only in cases "where it appears that he (the contractor) has endeavored to perform it in good faith and according to its terms, and has done so, except as to unimportant omissions or deviations, which are the result of inadvertence, and were not intentional, and which are susceptible of remedy, so that the other party will get substantially the building he has contracted for. * * * But the doctrine does not go to the extent of compelling a person to pay the contract price for a building differing in important particulars from that for which he has contracted. The defendant had a right to use his own judgment as to the kind of materials to be used in this structure, and his own taste to fix the style of its architecture. All the details were set out fully in the written specifications and contract. The contract governs their rights. Upon its performance the defendant had agreed to pay the contract price, and by a performance of its obligations, as a condition precedent, the plaintiffs are enabled to compel payment of the contract price and in that way only." The same rule is also well stated in volume 20, Am. & Eng. Enc. of Law (2d Ed.) p. 367, as follows: "Substantial performance permits only such omissions or deviations from the contract as are inadvertent and unintentional, are not due to bad faith, do not impair the structure as a whole, are remediable without doing material damage to other parts of the building in tearing down and reconstructing, and may without injustice be paid for by deductions from the contract price."

There are other defects complained of, which we will notice briefly, although we might, with propriety, rest the decision here.

The contract provided for finishing the front walls in what is known as "beaded finish." Such work is made by the use of a special instrument used for that purpose. It is considered superior and more artistic as a finish than trowel-struck work. It is admitted that no beaded work was done on the building. It is shown that, so far as the strength, durability, and utility of the wall is concerned, beaded work adds nothing to the value of the building. It affects the appearance only, and gives the front a better appearance. The only way that the beaded finish could now be given to the front would be to dig out the mortar and replace it by the beaded finish. The cost of this change would be from $50 to $60. Had it been done when the front was built, it would have cost but a trifle more in money or labor. It is a question of serious conflict whether the change could now be made without detriment to the wall as a protection from the elements. The specifications call for the use of "second common surfaced boards" for the second floor. It is admitted that No. 3 flooring was used. The cost of the kind used was less than what was called for by the specifications. To remedy the deviation would require a tearing up of the floor. The roof leaked in several places soon after it was placed on the building. A conflict exists as to whether the roof put on was such as was contracted to be used. The trial court found a deviation from the specifications in this respect, which could be remedied by an outlay of $100. We adopt this finding as sustained by the evidence, without any discussion of the evidence, except as to the cost of replacing, which is not required to be passed on by us in view of what has been hitherto said on the failure by plaintiffs to substantially comply with the contract. An iron ladder was specified to be built from rear stair steps between the rear windows, so as not to interfere with the opening of iron shutters. This was improperly done, in consequence of which the iron shutters struck against it, removing brick and injuring the shutters. This could be easily remedied. The window sills were not constructed according to plans and specifications. Split brick were used to finish out the front wall towards the top, contrary to the contract. The door and window frames were not made with No. 1 selected lumber, but of some inferior grade; the lumber used on the outside of the door frames being wet, green, and not seasoned. The difference of cost between what was used and what should have been used was about $2 per thousand. The plaintiffs do not deny that this deviation

fiom the specifications was made. They claim that the deficiency should be recompensed by allowing a deduction. There are other .admitted deviations from the specifications in matters susceptible ·of easy remedy, without much expense, and others claimed to exist concerning which the evidence conflicts, and found not to exist by the trial court. We have specified these several deviations, mostly .admitted, for the purpose of showing a basis for the application ·of another legal principle.

From the statement of deviations last mentioned, and outside of ·the construction of the walls improperly, to the· extent that recovery under the contract is not permissible, it is apparent that poor work pervaded the entire building. Noncompliance with the specifications was general, and compliance a rare exception. To hold that these deviations and omissions were not intentional would be a perverse disregard of the probative force of admitted facts. In some instances protests were made as to the class of work done .and materials used. It is not an excusable omission to follow the specifications to say that the contractor did not know that they .so provided. What is said in *Anderson* v. *Petereit,* 86 Hun. 600, .33 N. Y. Supp. 741, has peculiar application to this case: "The testimony introduced by the defendant showed defects which ran through the whole work. Foundations were of less size than specified, and constructed of inferior material. Timbers in the frame of the building and in the partitions were smaller than called for by the specifications. The chimneys were out of plumb, floors and ceilings out of level, walls uneven, and corners not square. Doors, windows, and blinds were defective and of poor material, and gen- ·erally defective work was the rule, and not compliance with the ·contract. And in one important particular the plans and specifica- tions were departed from to such an extent as to preclude the con- ·clusion of performance." In *Glacius* v. *Black,* 50 N. Y. 145, 10 Am. Rep. 449, it was expressed: "On the other hand, if these de- fects and omissions are so numerous and pervading as to show that .the whole job was done in a slovenly and improper manner, not conforming substantially with the plans and specifications, and there has been no waiver, there is no rule of law or morality which entitles the claimant to compensation." See, also, *Wollreich* v. *Fettretch* (Sup.) 4 N. Y. Supp. 326. The conclusion is plain from the whole evidence that the building as completed was not such as was contracted for. Two of plaintiff's expert witnesses

are forced to admit that the building was not in compliance with the specifications, and would not have been unconditionally accepted by them. An attempt is made to distinguish the facts of *Anderson* v. *Todd, supra,* from this case, but we think the principles laid down in that case control this, although the facts are not identical. That the counterclaim should have been allowed is not urged in this court. It was not seriously urged at the trial.

The judgment will therefore be affirmed. All concur.