Willard ODEGAARD, Plaintiff and Respondent,

v.

INVESTORS OIL, INC., a Minnesota Corporation, Defendant and Appellant,

and

Anchor Casualty Company, Defendant and Respondent.

No. 7995.

Supreme Court of North Dakota.

Aug. 17, 1962.

On Rehearing Dec. 11, 1962.

Vogel, Ulmer & Bair, Mandan, for plaintiff and respondent.

Cox, Pearce, Engebretson, Murray, Atkinson & Gunness, Bismarck, for defendant and appellant Investors Oil, Inc.

Nilles, Oehlert & Nilles, Fargo, for defendant and respondent Anchor Casualty Co.

MORRIS, Judge.

Investors Oil, Inc., defendant and appellant herein, is a Minnesota corporation that owns and operates an oil well located within the confines of the Garrison reservoir in North Dakota. The plaintiff and respondent, Willard Odegaard, is a construction contractor who on February 20, 1958, entered into a written agreement with Investors Oil, Inc., to build

> "a mound made of clean pit run gravel and graded field rock, said mound generally described as follows: The mound shall be in the shape of a frustum of a cone, with a bottom radius of One Hundred Thirty-nine and 5/10 (139.5′) feet and a top radius of Forty (40′) feet. The height of the mound shall be Sixty-three (63′) feet above elevation One Thousand Seven-Hundred Ninety-two (1792′) feet; said mound to be constructed in accordance with the attached Construction Drawing, which by reference is made a part hereof."

Anchor Casualty Company, defendant and respondent, a Minnesota corporation, on April 4, 1958, executed a bond as surety with Odegaard as principal and Investors Oil, Inc., as obligee, indemnifying the obligee against loss it might sustain by reason of the failure or default of Odegaard under the contract in the penal sum of $70,000.

The purpose of the mound was to protect the oil well against the rising and encroaching waters of the reservoir which had begun to flood the wellsite.

The plaintiff brought this action against Investors Oil, Inc., and in his complaint alleges that at the times mentioned therein William D. Walters was the vice president and an agent and employee of the defendant, authorized to make representations and perform the acts which the complaint alleges he made and performed on behalf of the defendant. It is then alleged that Walters began negotiating with the plaintiff for the construction of the mound in December, 1957; that he falsely and fraudulently assured the plaintiff that the well was located on a solid earth bottom at ground level when Walters well knew there was quicksand to a depth of 22 feet below that level; that Investors Oil, Inc., was only interested in protecting the well against the rising water, and that the plaintiff would be paid for all materials placed on the mound which were necessary to its protection, at the rate agreed upon. It is also alleged that pursuant to the oral agreement with Walters, the plaintiff, on January 20, 1958, commenced hauling gravel to the mound location; that in February, Walters, acting on behalf of the defendant, informed the plaintiff that the Corps of Army Engineers required that a written contract containing the specifications of the mound be filed and approved by them; that Walters again assured the plaintiff that if he protected the oil well from water he would be paid for all materials necessary to perform the task regardless of the exact specifications or estimates contained in the written contract, and that the plaintiff signed the contract on the strength of those representations.

With respect to furnishing material and the performance of the work, the complaint alleges:

"VII. That at the special instance and request of the defendant the plaintiff commenced hauling gravel for construction of said mound across the ice with trucks onto the location of said oil well on January 20, 1958, and continued until the 8th day of March, 1958, placing 33,834 yards of gravel on said mound; that from the 20th day of April, 1958, until the 22nd day of August, 1958, the plaintiff with use of a barge in said reservoir placed 75,600 yards of gravel and 6,000 yards of rock on said mound; that from December 14, 1958 to March 1, 1959, the plaintiff again hauled materials to said mound across the ice of said reservoir with trucks placing 19,872 yards of gravel and 5,100 yards of rock on said mound; that all of said materials placed on said mound so delivered and placed were worth the agreed and reasonable value of One Hundred Fifty-six Thousand One Hundred Forty and 70/100 ($156,-140.70) Dollars.

"VIII. That the plaintiff has substantially completed construction of said mound project and all of said materials so delivered and placed on said mound by plaintiff are necessary to the stability of said mound because of the quicksand bottom and placement in water all of which facts were known to defendant corporation; that said mound has been and now is used to the benefit of the defendant to protect said oil well from the waters of the Garrison Reservoir."

It is further alleged that a payment was made to the plaintiff in May, 1958, and another in the summer of 1959, in the total sum of $39,502.51. The plaintiff asks judgment for the balance of $116,638.19.

As a second count the plaintiff states that if recovery cannot be had upon express contract, he seeks recovery in the alternative on the theory of quantum meruit.

The defendant Investors Oil, Inc., filed an answer and counterclaim against the plaintiff and against Anchor Casualty Company in which the alleged statements and representations by Walters are denied as

well as matters with respect to the making of the contract or the supervision of the construction of the mound. It alleges the execution of the written contract and denies that any agreement was made with the plaintiff until February, 1958. It denies the placement of the amount of material alleged in the complaint, and states that the plaintiff breached the contract by failure to properly perform his obligations in accordance therewith. It is further alleged that additional work must be done to give the mound and the well proper protection which will cost in excess of $70,000, and that the plaintiff has refused to complete the structure and that the defendant will hold the Anchor Casualty Company responsible for the performance of the contract under its surety bond. Defendant then asks that the plaintiff's cause of action be dismissed, that Anchor Casualty Company be made a party defendant to respond to the counterclaim, and that the defendant have judgment against Odegaard and the Anchor Casualty Company in the sum of $70,000, for the cost of completion of the structure in accordance with the terms of the contract.

Upon an application of the Investors Oil, Inc. for an order making Anchor Casualty Company a party defendant to the counterclaim, the casualty company was made a party defendant and a summons, together with a copy of the answer and counterclaim, was ordered to be served on the casualty company.

The Anchor Casualty Company, pursuant to the court's order, served and filed its answer and reply to the counterclaim of Investors Oil, Inc., in which it denied the general allegations thereof. It admitted the issuance of the contract bond and alleged that the contract was so materially altered and changed by subsequent acts and agreements of the plaintiff and Investors Oil, Inc., that the bond became wholly invalid and unenforceable.

The plaintiff replied to the counterclaim of Investors Oil, Inc., realleging much of the material in his complaint. He also alleged that the defendant Investors Oil, Inc., breached the contract by failing to comply with the provision for payment to the plaintiff at the end of each fifteen-day period after the work commenced.

At the close of the submission of evidence, the defendant Investors Oil, Inc., moved the court to direct the jury to return a verdict of dismissal on the ground that all negotiations and transactions between Odegaard and Investors Oil, Inc., that preceded the contract were merged in the written contract, that there had not been a substantial compliance with the contract in that a substantial portion of the mound was composed of materials other than those specified, and that the mound was not protected by riprap consisting of specified materials nor was the riprap placed in the manner and thickness provided by the contract and that there is no clear or convincing evidence of agreed changes or modifications in the written contract sufficient to justify plaintiff's departures from the contract terms. The motion for a directed verdict was resisted by the plaintiff and the defendant Anchor Casualty Company and denied by the court. The jury returned a verdict in favor of the plaintiff and against Investors Oil, Inc., for $97,338.-97, and further found in favor of the defendant Anchor Casualty Company for a dismissal of the counterclaim against it. Judgment was entered in accordance with the verdict.

Investors Oil, Inc., made a motion for a judgment notwithstanding the verdict or in the alternative for a new trial, which was accompanied by specifications of error and insufficiency of the evidence. On December 7, 1960, the motion was denied.

■ On December 27, 1960, Investors Oil, Inc., filed its notice of appeal from the judgment and from the order of December 7, 1960, denying the alternative motion for judgment notwithstanding the verdict or for a new trial. The notice of appeal was accompanied by an undertaking on appeal. It was not accompanied by specifications of

errors at law or specifications of insufficiency of the evidence to sustain the verdict.

At the outset of our consideration of this appeal we are confronted with a practice question. The respondents assert that since specifications of error were neither attached to nor served with the notice of appeal, our review is limited to those errors which appear upon the judgment roll. This contention is based upon Section 28–18–09, NDCC, which in part provides:

"A party desiring to make a motion for a new trial or to appeal from a judgment or other determination of a district court or county court of increased jurisdiction, except upon appeals triable de novo in the supreme court, shall serve with the notice of motion, or notice of appeal, a concise statement of the errors of law he complains of, and if he claims the evidence is insufficient to support the verdict or that the evidence is of such character that the verdict should be set aside as a matter of discretion, he shall so specify."

At this point we are concerned with the extent of our review of the judgment and the order denying the alternative motion. In Ripplinger v. Otten, 77 N.D. 531, 44 N.W.2d 60, which involved an appeal from a judgment, this court, in the syllabus, said:

"Upon an appeal to the Supreme Court of an action not triable de novo upon appeal, neither errors of law occurring at the trial nor the sufficiency of the evidence may be reviewed in the absence of specifications of error."

The rule thus stated has been followed in Kemmer v. Sunshine Mutual Insurance Company, 79 N.D. 518, 57 N.W.2d 856, and Mills v. Roggensack, N.D., 92 N.W.2d 722, with respect to appeals from judgments, and in those cases it was held that upon an appeal from the judgment neither errors of law not appearing on the face of the judgment roll nor the sufficiency of the evidence may be reviewed in the absence of

specifications of error. However, in each of those cases there was also an appeal from an order denying a motion for a new trial. There was nothing before us on the appeals from the judgments in those cases, but since the motions for new trial had been accompanied by specifications, we reviewed the orders denying the new trials to the extent of the specifications that were before the trial court.

▌ In this case, although the attempted appeal from the judgment brings before us no errors at law and no questions of the insufficiency of the evidence, there remains the appeal from the order of December 7, 1960, denying the motion for a judgment notwithstanding the verdict or in the alternative for a new trial, under which we will review the correctness of the order with respect to the properly assigned specifications of error and insufficiency of the evidence.

"On appeal from an order made upon a motion in the alternative for judgment notwithstanding the verdict or for a new trial the court shall review the whole order and may reverse, affirm, or modify the order as to any and all parties." Section 28–27–29.1, NDCC.

▌ A motion for a judgment notwithstanding the verdict calls for a review of the court's ruling in denying the motion for directed verdict, and only the grounds assigned on the motion for directed verdict may be considered. See Kinnischtzke v. City of Glen Ullin, 79 N.D. 495, 57 N.W.2d 588; Jager v. Grommesh, N.D., 77 N.W.2d 873.

The motion of Investors Oil, Inc., for a directed verdict was based upon stated contentions that the evidence established that the work was performed by the plaintiff under a written contract, that prior negotiations were merged in that contract, that the mound was not constructed in substantial compliance with the contract, and that there is no clear and convincing evidence of

changes or modifications of the written contract.

■ In reviewing the sufficiency of the evidence, we consider it in the light most favorable to the verdict. The defendant Investors Oil, Inc., is a Minnesota corporation. The officers, stockholders and directors of the corporation consist of William D. Walters, Robert E. Hanson, and their wives. Walters is an oil broker with an office in Williston, North Dakota. He is vice president and a member of the board of directors of Investors Oil, Inc. That corporation has a North Dakota office in the office of Walters. It acquired an oil lease within the confines of the Garrison reservoir. It drilled an oil well, which it completed in April, 1957, on its leased property. The reservoir is created by a dam constructed by the United States Government across the Missouri River. The river is approximately seven-eighths of a mile directly south of the well. In the summer of 1957 the reservoir waters rose sufficiently to cover the wellsite. Walters consulted the U. S. Corps of Engineers as to requirements for building a protective structure around the well. Investors Oil, Inc., employed an engineer, Dois D. Dallas, with whom Walters consulted in regard to technical problems. Walters made arrangements with the Mendenhall construction company to deposit gravel around the well. About 10,000 yards of gravel was so deposited. This was accomplished with the use of a barge because the water was then ten or twelve feet deep around the well. In November of 1957, the plaintiff, Odegaard, began a series of conferences with Walters and Dallas, and sometimes with Walters alone, about continuing the construction of a mound for the protection of the well. They discussed the necessity of securing the approval of the Corps of Engineers. Odegaard was concerned about the soil bottom on which the mound would be built. Odegaard testified that Walters told him that the bottom was good as far as he knew. The mound was to be constructed mostly of gravel and rock. According to Odegaard, Walters told him that he could start stockpiling rock in the vicinity of the well and that Odegaard would be paid $2.00 per cubic yard in the stockpile, and later if he got the job of constructing the mound he would be paid $3.00 per cubic yard in place on the mound. He started stockpiling the rock in December, 1957. The first plan for the mound had been rejected by the Corps of Engineers and conversations were still in progress concerning the specifications. Odegaard testified that Walters told him near the end of January, 1958, that he could go ahead and start building the mound, although at that time a specific contract then planned had not been signed or agreed upon. According to Walters, he told Odegaard that he would be paid for the gravel if it fell within the confines of the mound according to the finally approved plan. About January 20, 1958, Odegaard began hauling gravel over the ice and dumping it through holes into the water, and continued until in March, when the ice would no longer sustain the operation.

Hauling and dumping gravel was resumed by barge, and later continued by truck. Rock was hauled in as riprap and the mound completed, at least to the extent which Odegaard claims amounts to substantial compliance with the agreement of the parties

What the parties actually agreed upon constitutes major disputes in both testimony and contentions of the respective parties. The plaintiff contends that he started to work under oral promises, later signed a written contract mainly for the purpose of satisfying the requirements of the Corps of Engineers, and that this contract was later modified through the supervision and acquiescence of Walters and Dallas, and by acceptance of the work by Investors Oil, Inc.

In January, 1958, at the time Walters told Odegaard to go ahead with the work, they discussed a second plan which included a sketch of the base of the mound which showed a slope of one foot vertical to two

feet horizontal. Odegaard said that he told Walters it would be impossible to put in a slope under water at that ratio, and that the gravel would go to a 6 to 1 slope. He then testified that Walters told him that "they would pay me for everything that went 6 to 1." Walters also said that it was necessary for Odegaard to sign a contract, have it bonded, and send it to Minneapolis. Later Walters and Odegaard met in an attorney's office where Odegaard signed a contract dated February 20, 1958. It was then sent to Minneapolis where it was acknowledged by Robert Hanson, president of Investors Oil, Inc., on February 26, 1958. Odegaard states that at the time he signed the contract there were no plans and specifications attached to it. The next time he saw the contract was in April, 1958. He denies that he ever agreed to the plans, "Because the slope always showed 2 to 1 and I never agreed to 2 to 1 slope, I said 6 to 1 under water." However, he continued with the work.

The contract is in evidence as the defendant's exhibit D. It provides that Odegaard should build in a substantial and workmanlike manner a mound of clean pit run gravel and graded field rock in the shape of a frustum of a cone with a bottom radius of 139.5 feet and a top radius of 40 feet, the height to be 63 feet above the elevation of 1,792 feet. The mound was to be constructed in accordance with an attached construction drawing called the plan and made by reference a part of the contract. Odegaard was to be paid the sum of 95¢ per yard for clean pit gravel used in the mound, and $3.00 per cubic yard of graded field rock. It was estimated that it would take between 44,220 and 54,220 cubic yards of gravel and 7,320 cubic yards of field rock.

The contract further provides:

"* * * that Dois D. Dallas shall be the Supervising Engineer of the work, and that his decision as to the type and manner of the work shall be followed by the Contractor."

It provides that the contractor shall furnish a $70,000 surety bond conditioned that the contractor shall well and truly perform the agreements and terms of the contract. It also provides that:

"Any defects, shrinkage or other faults which may appear in the construction of the mound arising from materials or workmanship not in accordance with the drawings and specifications, or the instructions of the Engineer, Dois D. Dallas,"

shall within a reasonable time be corrected. The attached plan shows the mound with a base radius of 139.5 feet and a top radius of 40 feet, consisting of a core of 54,220 cubic yards of pit run gravel and an outer wall described by witnesses as riprap consisting of 7,320 cubic yards of graded field rock. The mound is shown resting on original ground at an elevation of 1,792 feet. The elevation of the top of the mound is 1,855 feet, or 63 feet above the original ground. The contract provided:

"* * * that the sand and field rock shall be paid for by measurement in place, and said sand and gravel to be paid for to be within the confines of the mound as herein described."

The mound was built to an elevation of about 1,856 feet, or a height of about 64 feet above ground level.

■■ The evidence shows that the soil on which the mound rested was saturated with water. Testimony is conflicting as to the amount of subsidence or settling that took place. Odegaard testified that a considerable amount of the rock that he dumped as riprap disappeared into the soil below. Both Dallas and Walters were aware of the nature of the soil on which the mound was to be built. Dallas, the engineer employed by Investors Oil, Inc., visited the mound on an average of three times a week during its construction. He had frequent consultations with Odegaard and Walters both before and after the written contract was signed. There is much conflict of testi-

mony concerning these conversations. According to Odegaard, Dallas did not complain about the way the mound was being constructed, while Dallas says that he pointed out to Odegaard that some of the material being used in the top part of the structure did not comply with the contract. Odegaard produced evidence showing the amounts of the various materials that he hauled to and dumped onto the mound site. Investors Oil, Inc., produced an expert witness, Barr, who made borings, samplings and measurements and from them gave his opinion as to the amount of material in the mound and its nature.

> "The question upon a motion for judgment notwithstanding the verdict is whether the party making the motion was entitled to directed verdict at the time the motion for a directed verdict was made, * * *."

Lee v. AAA North Dakota Automobile Club, N.D., 68 N.W.2d 835. On the three points set forth in the motion for a directed verdict substantial issues of fact were presented by the record. At the time the motion for a directed verdict was made there was evidence that had been admitted and was before the jury sufficient to support the verdict. The trial court did not err in denying the motion for judgment notwithstanding the verdict for the defendant Investors Oil, Inc.

We now go to the questions presented by the motion for a new trial. In considering the specifications of error, we call attention to pertinent statutes and rules of law. Section 9-06-07, NDCC, provides:

> "The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument."

This statute sets forth a rule of substantive law. Hanes v. Mitchell, 78 N.D. 341, 49 N.W.2d 606; Northwestern Equipment, Inc. v. Tentis, N.D., 74 N.W.2d 832.

In Larson v. Wood, 75 N.D. 9, 25 N.W.2d 100, and Mevorah v. Goodman, 79 N.D. 443, 57 N.W.2d 600, 49 A.L.R.2d 825, we held that a written contract supersedes all discussions, conversations and oral negotiations concerning the subject matter of the contract which preceded or accompanied its execution. This rule, however, presupposes that the entire subject matter involved in the prior negotiation was included within the framework of the written contract and does not exclude the possibility of a contract being partly oral and partly written. In Putnam v. Prouty, 24 N.D. 517, 140 N.W. 93, this Court considered the admission of evidence of parol stipulations not covered in a written contract and approved the following quotation from Wheaton Roller-Mill Co. v. John T. Noye Mfg. Co., 66 Minn. 156, 68 N.W. 854:

> "All the authorities are substantially agreed that where, in the absence of fraud, accident, or mistake, the parties have deliberately put their contract into a writing which is complete in itself, and couched in such language as imports a complete legal obligation, it is conclusively presumed that they have introduced into the written instrument all material terms and circumstances relating thereto. But the point upon which the courts have sometimes differed is as to how the incompleteness of the written contract may be made to appear. Some cases seem to go to the length of holding that this may be done by going outside of the writing, and proving that there was a stipulation entered into, but not contained in it, and hence that only part of the contract was put in writing. If any such doctrine is to obtain, there would be very little left of the rule against varying written contracts by parol. Such is not the law. Other cases seem to go almost to the other extreme, by holding that the incompleteness of the writing must appear on the face of the document from mere inspection. But to furnish a basis for the admission of pa-.

rol evidence the incompleteness need not be apparent on the face of the instrument. If the written contract, construed in view of the circumstances in which, and the purpose for which, it was executed,—which evidence is always admissible to put the court in the position of the parties—shows that it was not meant to contain the whole bargain between the parties, then parol evidence is admissible to prove a term upon which the writing is silent, and which is not inconsistent with what is written; but, if it shows that the writing was meant to contain the whole bargain between the parties, no parol evidence can be admitted to introduce a term which does not appear there. In short, the true rule is that the only criterion of the completeness of the written contract as a full expression of the agreement of the parties is the writing itself; but, in determining whether it is thus complete, it is to be construed, as in any other case, according to its subject-matter and the circumstances under which and the purposes for which it was executed."

See also Gilbert Manufacturing Co. v. Bryan, 39 N.D. 13, 166 N.W. 805; Udgaard v. Schindler, 75 N.D. 625, 31 N.W.2d 776.

■ In Williston on Contracts, Revised Edition, Volume Three, Section 636, we find that:

"The parol evidence rule assumes agreement upon the writing in question as a complete statement of the bargain, that is, as an integration. If the parties never adopted the writing as a statement of the whole agreement, the rule does not exclude parol evidence of additional promises.

"It should be observed, however, that a writing though incomplete may, nevertheless, be adopted as the expression by the parties of that portion of their agreement to which it relates. Accordingly, if a contract is even partially reduced to writing, the written portion is no more subject to contradiction by parol than the entire contract would be had it been wholly reduced to writing."

■ Three plans for the construction of the mound were submitted to the Army Engineers, the first dated December 23, 1957, the second dated January 16, 1958, and the third dated February 11, 1958. The first two were rejected. The third was approved and attached to the written contract signed by Odegaard on February 20, 1958. The second plan showed a mound with a top radius of 40 feet and a bottom radius of 120 feet. It was to contain 29,750 cubic yards of pit run gravel and 13,120 cubic yards of graded field rock. The third and final plan showed a mound with a top radius of 40 feet and a bottom radius of 139.5 feet. The materials are stated to be 54,220 cubic yards of pit run gravel and 7,320 cubic yards of graded field rock. The height of the mound above original ground level was shown on both plans to be 63 feet. Thus it appears that the plan for the base of the mound showed considerable enlargement before final acceptance. The amount of field rock was diminished and the amount of gravel increased. The work of hauling material to the mound was begun under an oral arrangement with Walters about a month before the contract was signed. Under a still earlier oral agreement, Odegaard had stock-piled a quantity of field rock near the wellsite. During all of this time the well had been out of production. The engineers were interested in protecting the waters of the reservoir from oil pollution. Investors Oil, Inc., was interested in being permitted to resume production, while Odegaard was anxious to begin construction. The Corps of Army Engineers was not a party to the contract. The inference is strong that one of the chief inducements to the execution of the written contract, which included the plan, was to satisfy requirements of the engineers, and that as far as the parties were concerned, they were willing to begin construction under an oral agreement. Under these circumstances there is no presumption that the written contract was intended

by the parties to be complete in itself and that it superseded all prior negotiations. We therefore reach the conclusion that evidence of prior negotiations which does not tend to contradict or modify the written contract is admissible.

■ On its motion for a new trial, Investors Oil, Inc., specifies the admission in evidence of the first two plans as error, the objection being that they were superseded by the third plan which was attached to and became a part of the written contract. We find no prejudicial error in the admission of the two plans. They go to show the circumstances and negotiations, including the part played by the Corps of Army Engineers, and do not conflict with or tend to modify that part of the final contract which was reduced to writing.

■ Investor Oil, Inc., specifies as error the admission in evidence of exhibits 12, 13 and 14 over objection. These exhibits are records or copies of records identified by the plaintiff or his employees as showing amounts of material conveyed to and deposited on the mound by the plaintiff during construction. Each exhibit was objected to as an attempt to prove the quantity of materials by a means other than measurement in place which Investors Oil, Inc., contends is the means of determining quantity specifically provided for by the written contract and cannot be contradicted or varied by parol. Exhibits 12 and 13 deal exclusively with gravel.

Referring to the written contract, we find that near the beginning it provides that the mound should be made of clean pit run gravel and graded field rock. This paragraph appears later:

"It is understood further that there is approximately 10,000 cubic yards of gravel now in place and for which allowance shall be made, and that the sand and field rock shall be paid for by measurement in place, and said sand and gravel to be paid for to be within

the confines of the mound as herein described."

It is clear that the quantity of field rock to be paid for is to be determined by measurement in place, which would exclude evidence of the quantity of rock hauled. The method by which the quantity of gravel is to be determined is not stated, although it must be within the confines of the mound. The provisions with respect to the quantity of gravel are ambiguous. They do not exclude other methods of determining the quantity than measurement in place. The court did not err in failing to exclude exhibits 12 and 13 on the ground that they were immaterial.

■ Exhibit 14, consisting of three sheets of paper attached to a pasteboard back, was introduced in evidence in connection with the testimony of plaintiff's witness Neether who was employed by the plaintiff as assistant foreman. He was in charge of loading trucks with material and hauling it to the mound in the winter of 1958–1959. The mound then extended above the ice. The exhibit shows the number of loads and the cubic yards per load hauled from December 18, 1958 to March 1, 1959, inclusive. Some loads are listed as gravel and some as rock. Neether testified that as each load was hauled he wrote it down in a little notebook; the notebook got dirty, and after the job was completed in March, 1959, he copied the figures on the sheets of paper, exhibit 14, and that the notebook had exactly the same figures in it as does exhibit 14. The witness no longer had the notebook at the time of trial. The exhibit was objected to,

"as it is not the best evidence, it is not an original record, that it is an attempt to prove a certain amount of gravel by trucks hauling rather than measurement of materials in the mound which is the method specified in the contract. It is immaterial to the issues of this case."

We think the foundation was sufficient under the best evidence rule and the exhibit

does not tend to contradict or vary the terms of the written contract. The court did not err in overruling the objection.

■ The next exhibits challenged as being erroneously admitted are 15 and 16, both of which were read at length to the jury by plaintiff's counsel immediately after admission. The first of these exhibits is a copy of a petition asking that the Industrial Commission of the State of North Dakota make its order to the effect that Investors Oil, Inc. had sufficiently complied with a previous order of the Commission requiring the construction of an island in accordance with specifications of the U. S. Army Corps of Engineers so as to permit the well to produce above water.

It also recites that the well

"is now being operated above the water and in such a manner as to comply with the requirements of said Order No. 307.

"That said island has not been completed strictly in accordance with the specifications of the U. S. Army Corps of Engineers, and that litigation is pending between this petitioner and said contractor and his surety in connection with said construction, but that nevertheless the island which has been constructed is sufficient to protect said oil well and the formations through which it passes under the statutes, rules and regulations of the North Dakota State Industrial Commission."

One of the issues in this case is that of substantial compliance by the contractor. Statements contained in the application were sufficiently pertinent to that issue to render the exhibit material as an admission on the part of Investors Oil, Inc.

■ Exhibit 16 is an order of the Industrial Commission finding the facts as set out in the petition and determining that its Order No. 307 be deemed to have been sufficiently complied with. The Industrial Commission is endowed by statute with certain powers regarding the development of oil fields and the regulation of oil wells. Its findings and order are but conclusions and are irrelevant and immaterial to the issues in this case. The court erred in admitting the order in evidence.

■ Investors Oil, Inc., specifies as error the following instructions pertaining to the quantity of material:

"However, plaintiff, Odegaard, was necessarily required to use a much greater quantity of gravel and rock than stated in the contract estimate, and plaintiff in his complaint alleges in paragraphs 7, 8 and 9 thereof as follows:—"

and

"Thus, if the jury should find that Odegaard and the Defendant, did in fact, by oral agreements modify and alter the written contract as Plaintiff, Odegaard, alleges, then such oral agreements were 'executed oral agreements' since Odegaard did place in the mound a much greater quantity of gravel and rock than the estimated quantity stated in the written contract."

It is argued that these instructions are contrary to those given by the court to the effect that plaintiff was required to prove the allegations of his complaint to the jury's satisfaction by a fair preponderance of the evidence and that the two instructions in effect took from the jury the question of fact of whether Odegaard did place in the mound a much greater quantity of gravel and rock than the contract estimates. There is merit to this contention. While the evidence introduced by Odegaard did tend to show that he had conveyed to the mound a much greater quantity of material than the contract estimates indicated, on the other hand testimony of the witness for the defendant, Barr, presents a conflicting picture. He found only 54,776 cubic yards of core material within the dimensions of the mound as shown by the plan attached to the contract, and 3,810 cubic yards of gravel

outside of those dimensions. He also found that there was 3,485 cubic yards of riprap covering the surface of the mound and rocks stockpiled at the base of the mound in a windrow. In calculating these quantities he included estimates of the amount of material that had settled below ground level. The statement of the court impinged upon the province of the jury and constitutes error. The error is aggravated by the fact that the court in connection with the first of these instructions read paragraphs 7, 8 and 9 to the jury. The paragraphs allege in considerable detail the placing on the mound by the plaintiff of 129,306 cubic yards of gravel and 11,100 cubic yards of rock of a total value of $156,140.70, payments by Investors Oil, Inc. of $39,502.51, and a balance claimed to be due to the plaintiff of $116,638.19. See Black v. Smith, 58 N.D. 109, 224 N.W. 915.

 Investors Oil, Inc., specifies as error the giving of this instruction:

"You are further instructed that substantial performance of a contract means not doing the exact thing promised but doing something else that is just as good or good enough to reasonably meet the obligation under the contract of the one who claims substantial performance."

In Anderson v. Todd, 8 N.D. 158, 77 N.W. 599, Syllabus 1, this Court said:

"To entitle a contractor to recover upon a building contract, which has not been fully complied with by him, under the doctrine of substantial compliance, it must appear, not only that he endeavored to perform it in good faith, but also that he has done so, except as to unimportant omissions or deviations, which are the result of mistake or inadvertence, and were not intentional, and which are susceptible of remedy, so that the other party will get substantially the building he contracted for."

The rule thus stated was applied in Braseth v. State Bank, 12 N.D. 486, 98 N.W. 79.

Both of these cases involve the foreclosure of mechanic liens.

In Williston on Contracts, Revised Edition, Volume Three, Section 805, page 2262, it is said:

"Where the rule of substantial performance prevails it is essential that the plaintiff's default should not have been willful; and the defects must not be so serious as to deprive the property of its value for the intended use nor so pervade the whole work that a deduction in damages will not be fair compensation."

The definition of substantial performance contained in the challenged instruction is clearly erroneous when judged by these rules. It invites a disregard of all of the provisions of a construction contract except the result.

Investors Oil, Inc., in its motion for new trial charges that the evidence is insufficient to sustain the verdict. It is argued that there is a lack of

"* * * any clear and convincing evidence, that there was any mutual modification of the written contract, so as to authorize Odegaard as the contractor to place in the mound additional quantities of rock and gravel, subsequent to its execution on the 20th day of February, 1958."

We note that the court in unchallenged instructions advised the jury that:

"Evidence to establish a modification or alteration of a written contract must be clear and convincing, although it need not be uncontroverted. A preponderance of the evidence will suffice so long as it is clear and convincing."

"The question is 'did Odegaard as the contractor and a duly authorized agent of the owner, Investors Oil Inc., enter into oral contracts or agreements modifying and altering the written contract so as to authorize Odegaard as the

contractor to place in the mound the additional quantities of gravel and rock?' This is a question of fact to be determined by the jury, guided by the law as set forth in this Charge to the Jury."

It is obvious that both the court and the counsel did not have the provisions of the written part of the contract clearly in mind. Quantities of material are not stated in definite amounts. They are merely estimated, and subsequent agreements concerning quantities, whether orally expressed or implied, neither conflict with, alter or modify the express provisions of the written contract. However, taking the instructions as the law of the case and binding on the jury, a review of the record leads us to the conclusion that it is sufficient to warrant the jury to determine by a clear and convincing preponderance of the evidence that the placing of quantities of gravel and rock in the mound in excess of the estimates was authorized.

■ We next consider the sufficiency of the evidence to support the verdict in the amount for which it was rendered. The verdict was for $97,338.97. The evidence introduced by the plaintiff accounts for 102,081 cubic yards of gravel which at the contract price of 95¢ per cubic yard amounts to $96,976.95, and 11,100 cubic yards of rock at $3 per yard amounts to $33,300, making a total amount of $130,276.95, upon which the plaintiff received $39,807.61, leaving a balance of $90,469.34 for which a verdict might have been rendered. Thus the verdict is excessive to the extent of $6,869.63. The plaintiff argues that the testimony indicated that the yardages as computed in the exhibits were conservative and that most of the loads were heaped and actually contained considerably more material than was shown. It is asserted that the jury had a right to take the heaping loads into consideration in calculating their value. This calls for pure speculation on the part of the jury and will

not support the excessive verdict. The plaintiff in his brief says:

"However, if the Court feels that Odegaard should be bound by the exact figures, we suggest that the Court exercise its powers and reduce the verdict to $90,469.34."

Such a course on our part might be justified if there were no prejudicial errors in the record and the only question involved was the amount of the recovery. In view of those errors and the excessive verdict, we hold that the verdict and the judgment rendered thereon must be set aside and a new trial granted.

A number of instructions were requested by Investors Oil, Inc., and the failure of the court to give them is assigned as error. We have considered them in connection with the record upon which the case was submitted to the jury and do not find that any of the refusals to instruct as requested resulted in prejudicial error.

■ The Anchor Casualty Company was made a party defendant to the action and is a respondent on this appeal. When the verdict was found in favor of the plaintiff it was proper for the jury to exonerate the surety as it did by rendering a verdict in favor of Anchor Casualty Company for a dismissal of the counterclaim against it. 9 Am.Jur., Building and Construction Contracts, Section 88; 50 Am.Jur., Suretyship, Section 30. However, our reversal of the judgment sets aside the exoneration of the surety and leaves the question of the liability of the Anchor Casualty Company to be determined on the new trial.

■ Embraced in this record is an appeal from an order of December 7, 1960, denying a motion to modify the judgment by striking therefrom an item of interest in the sum of $6,517.70. Since the judgment is reversed in its entirety, the appeal from the order to modify it becomes moot and the appeal is therefore dismissed.

SATHRE, C. J., and BURKE, TEIGEN and STRUTZ, JJ., concur.

## ON REHEARING.

All parties having petitioned for a rehearing, a reargument was had. Upon a reconsideration of all points raised in the petitions and oral argument, we adhere to our former opinion.

SATHRE, C. J., STRUTZ and TEIGEN, JJ., concur.

BURKE, Judge (concurring specially).

I concur with the majority in holding that the contract, here in issue, does not contain the entire agreement between the parties and that parol testimony is admissible to establish that part of the contract not included in the writing. The contract by its express terms provides for payment only for gravel placed in the mound above ground level. It makes no provision whatever for payment for gravel which subsided below ground level to form the support or foundation for the mound.